## In re SAFETY COMPONENTS, INC. SECURITIES LITIGATION.

### No. CIV. A. 00–0082(AJL).

United States District Court,
D. New Jersey.

Sept. 27, 2001.

Keith M. Fleischmann, Milberg Weiss Bershad, Hynes & Lerach LLP, New York, NY, Robert J. Berg, Bernstein Liebhard & Lifshitz, LLP, Fort Lee, NJ, Samuel B. Sporn, Shoengold & Sporn, P.C., New York, NY, Paul Geller, Shepard & Geller L.L.C., Boca Raton, FL, Jules Brody, Stull Stull & Brody, New York, NY, Leo Desmond, The Desmond Law Firm, Palm Beach, FL, Joseph H. Weiss, Weiss & Yourman, New York, NY, Brian Murray, Rabin & Peckel, New York, NY, Lionel Z. Glancy, The Law Offices of Lionel Z. Glancy, Los Angeles, CA, for plaintiffs.

Michael R. Young, Willkie Farr & Gallagher, New York, NY, William B. McGuire, Tompkins, McGuire, Wachenfeld & Barry, Newark, NJ, for Defendants Safety Components International, Inc., George D. Pa-

padopoulos, Jeffrey Kaplan, and Francis X. Suozzi.

Lanny J. Davis, Patton Boggs LLP, Washington, DC, for Robert A. Zummo.

Sallie G. Smylie, Kirkland & Ellis, Chicago, IL, for Arthur Andersen LLP.

## OPINION

LECHNER, District Judge.

This was a consolidated class action brought on behalf of all purchasers of the common stock of Safety Components International, Inc. ("SCII") during the period 28 May 1997 to 10 April 2000, inclusive (the "Class Period") against defendants SCII, Robert A. Zummo ("Zummo"), Jeffrey J. Kaplan ("Kaplan"), George D. Papadopoulos ("Papadopoulos"), and Francis X. Suozzi ("Suozzi") (collectively, the "Defendants").

The consolidated amended complaint (the "Complaint") alleged violations of Section 10(b), as amended 15 U.S.C. § 78j(b), and Section 20, as amended 15 U.S.C. § 78t, of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. A proposed second consolidated amended class action complaint (the "Proposed Amended Complaint"), which was not filed, would have alleged violations of Federal securities laws by Arthur Andersen LLP ("Arthur Andersen").

A settlement (the "Settlement") was agreed to on or about 16 April 2001 by lead plaintiffs Joseph LaMotta and Jay Langner (the "Lead Plaintiffs"), the Defendants and Arthur Andersen. The Settlement was preliminarily approved by way of order, dated 10 May 2001 (the "10 May 2001 Order").

Currently pending is an unopposed motion to approve the Settlement and to approve the application for an award of attorney's fees and reimbursement of expenses (the "Application for Attorneys' Fees") (collectively, the "Motion for Approval").[1] For the reasons set forth below, the Motion for Approval is granted, except to the extent the Application for Attorneys' Fees is modified below.

*Facts and Procedural History*

### A. The Purchase Of Valentec

SCII is a low-cost supplier of fabric and cushions used in automotive airbags with operations in North America, Europe and Asia. Complaint, ¶ 3; Fleischman Decl., ¶ 17. Zummo, Kaplan, Papadopoulos, and Suozzi (the "Individual Defendants") are current or former officers and/or directors of SCII. Complaint, ¶ 12; Fleischman Decl., ¶ 19. Zummo was the Chairman of

---

1. In support of the Motion for Approval, Lead Plaintiffs submitted: (1) a memorandum of law in support of the Settlement (the "Memorandum in Support of the Settlement"), (2) a memorandum of law in support of counsels' Application for Attorneys' Fees, and (3) the declaration of Keith M. Fleischman (the "Fleishman Decl.").

In support of the Application for Attorney's Fees, Lead Plaintiffs submitted a compendium of plaintiffs' counsels' affidavits in support of joint petition for fees and expenses (the "Compendium of Counsels' Affidavits"). The Compendium of Counsels' Affidavits includes: (1) the affidavit if Keith M. Fleischman (the "Fleischman Aff."), (2) the affidavit of Shan-

darese Garr (the "Garr Aff."), (3) the affidavit of Leo W. Desmond (the "Desmond Aff."), (4) the affidavit of Mel. E. Lifshitz (the "Lifshitz Aff."), (5) the affidavit of James E. Tullman (the "Tullman Aff."), (6) the declaration of Lionel Z. Glancy, (7) the affidavit of Joseph V. McBride, (8) the affidavit of Paul J. Glesser, (8) the affidavit of Aaron Brody (the "Brody Aff."), (9) the affidavit of Ashley Kim and (10) the letter of Melvin E. Gavron, certified fraud examiner.

Lead Plaintiffs also submitted, on 19 September 2001, a supplemental memorandum of law in support of the Application for Attorneys' Fees (the "Supplemental Memorandum").

the Board, Chief Executive Officer and President of SCII from January 1994 until March 1999. Fleischman Decl., ¶ 19. Kaplan was the Executive Vice President and Chief Financial Officer of SCII. *Id.* Papadopoulos was the Corporate Controller and Principal Accounting Officer of SCII. *Id.* Suozzi was a director of SCII. *Id.* Arthur Andersen was the outside auditor of SCII during the Class Period. *Id.*, ¶ 3.

During the Class Period, SCII stock traded as high as $19 per share. Complaint, ¶ 5; Fleischman Decl., ¶ 17. By the close of the Class Period, however, SCII stock had been de-listed by NASDAQ and was traded on the "pink sheets" for approximately $.50 per share. Complaint, ¶ 5; Fleischman Decl., ¶ 17. Lead Plaintiffs allege the sharp drop in the price of SCII stock resulted largely from the Individual Defendants' pursuit of their personal financial interests to the detriment of the interests of SCII and its shareholders. Complaint, ¶ 27; Fleischman Decl., ¶ 18. Lead Plaintiffs allege that the Individual Defendants pursued their own interests by effecting the purchase of Valentec International Corporation ("Valentec"), a related entity controlled by Zummo, despite their knowledge of its poor financial condition. Fleischman Decl., ¶ 18; Transcript of 14 September 2001 Hearing (the "Fairness Hearing Transcript") at 7:23–24.

SCII originated as a wholly owned subsidiary of Valentec. Fleischman Decl., ¶ 20. Valentec spun off SCII as a separate entity through an initial public offering in May of 1994. *Id.;* Fairness Hearing Transcript at 7:18–19. Lead Plaintiffs allege that, even after the spin-off, SCII and Valentec continued to function as one entity and employees believed the two entities to be divisions of the same company. Complaint, ¶ 19; Fleischman Decl., ¶ 20.

Lead Plaintiffs allege that Valentec was experiencing severe financial difficulties by 1997. Complaint, ¶ 20; Fleischman Decl., ¶ 21. These difficulties included a history of losses, a retained earnings deficit, an excess of liabilities over assets and a working capital deficiency. Complaint, ¶ 20; Fleischman Decl., ¶ 21. Lead Plaintiffs further allege that Valentec had undisclosed contingent liabilities stemming from a Department of Justice investigation and a pending civil suit. Complaint, ¶¶ 44–46; Fleischman Decl., ¶ 21. The Department of Justice investigation, Lead Plaintiffs assert, concerned bid-rigging and kick-back antitrust violations committed by Valentec. Complaint, ¶¶ 44–46; Fleischman Decl., ¶ 21. Lead Plaintiffs further allege that SCII advanced $5.6 million to Valentec by May of 1997 to address these financial difficulties. Complaint, ¶ 23; Fleischman Decl., ¶ 21.

Lead Plaintiffs allege that the Defendants orchestrated the purchase by SCII of Valentec (the "Transaction") at a grossly inflated price that could not have been obtained in the open market through arm's length negotiations. Complaint, ¶ 24; Fleischman Decl., ¶ 22. Lead Plaintiffs argue that the Transaction was effected to prevent Zummo from losing his interest in SCII and to avoid substantial financial losses on the part of the Individual Defendants. Complaint, ¶ 24; Fleischman Decl., ¶ 22. Lead Plaintiffs further allege that the debt load of Valentec had grown to the point where SCII's lenders, in the absence of the Transaction, would have required a debt pay-down by Valentec. Complaint, ¶ 24; Fleischman Decl., ¶ 22. Valentec could have accomplished this pay-down only by selling its sole asset—1,379,200 shares of SCII common stock. Complaint, ¶ 24; Fleischman Decl., ¶ 22.

Lead Plaintiffs allege that the Defendants actively concealed, from the public and the SCII shareholders, their knowledge of the financial difficulties facing Va-

lentec. Complaint, ¶ 27; Fleischman Decl., ¶ 23. Lead Plaintiffs further allege that the Defendants employed the following practices to hide the probable financial condition of SCII following the transaction:

1. The Defendants filed financial statements that did not conform to Generally Accepted Accounting Principles ("GAAP"). Complaint, ¶¶ 32–51; Fleischman Decl., ¶ 23.

2. The Defendants artificially inflated net sales and net income on the financial statements of SCII for the fiscal years 1998 and 1999 and for the first quarter of fiscal year 2000 by "double-booking" approximately $4.6 million worth of its purported revenue. Complaint, ¶¶ 47–51; Fleischman Decl., ¶ 23.

3. The Defendants made statements about the benefits of the acquisition of Valentec, concerning cost efficiencies and economies of scales, that were false and misleading because the two companies were already operating as one entity. Complaint, ¶¶ 47–51; Fleischman Decl., ¶ 23.

4. The Defendants attributed $19.9 million of goodwill to the purchase of Valentec despite their knowledge that the company was worthless. Complaint, ¶¶ 40–43; Fleischman Decl., ¶ 23.

5. The Defendants concealed, until after the transaction, material contingent liabilities, including the Department of Justice investigation and a pending civil claim. Complaint, ¶¶ 44–46; Fleischman Decl., ¶ 23.

6. The Defendants shipped products that they knew would be returned for non-conformity with customer specifications in order to recognize improperly revenue with respect to those shipments. Complaint, ¶¶ 33–35; Fleischman Decl., ¶ 23.

7. The Defendants back dated contracts and shipping documents to report improperly revenue in the quarter prior to that in which it should have been reported. Complaint, ¶ 36; Fleischman Decl., ¶ 23.

8. The Defendants overbilled and overaccrued the revenue of SCII with respect to a contract with a major customer, resulting in an overstatement of revenue and the carrying of fictitious receivables. Complaint, ¶ 37; Fleischman Decl., ¶ 23.

9. The Defendants materially overstated SCII's assets by failing to accurately account for depreciation of equipment. Complaint, ¶ 38; Fleischman Decl., ¶ 23.

10. The Defendants instructed the controllers of SCII to manipulate SCII's results. Complaint, ¶ 39; Fleischman Decl., ¶ 23.

On 9 November 1999, SCII issued a press release announcing that it would restate its financial reports for two fiscal years and one quarter of another fiscal year. Complaint, ¶ 102; Fleischman Decl., ¶ 24. On 10 November 1999, SCII was delisted from NASDAQ. Complaint, ¶ 105; Fleischman Decl., ¶ 24. Lead Plaintiffs assert SCII acknowledged, on 8 February 2000, it had improperly accounted for the goodwill attributed to Valentec. Complaint, ¶ 105; Fleischman Decl., ¶ 24. By 8 February 2000, SCII stock was trading, via the "pink sheets," at approximately $.50 per share. *Id.* SCII filed for Chapter 11 bankruptcy protection on 10 April 2000. Complaint, ¶ 105; Fleischman Decl., ¶ 24.

B. *Investigation and Commencement of Suit by the Plaintiffs*

In or about November 1999, eight separate but related actions (the "Individual

Actions") were filed in this District against SCII and various SCII officers and directors alleging Federal securities laws violations. Fleischman Decl., ¶ 10. On or about 25 February 2000, these eight separate actions were consolidated into the pending matter.[2] Order dated 25 February 2001 at 2. (the "25 February 2000 Consolidation Order").

Prior to the filing of the Individual Actions, counsel for the plaintiffs ("Plaintiffs' Counsel") conducted an extensive investigation of the facts surrounding the Transaction. Fleischman Decl., ¶ 25; *see also* Desmond Aff., ¶ 2(a); Tullman Aff., ¶ 2; Brody Aff., ¶ 3. This investigation continued after the filing of the Individual Actions, permitting the filing of a detailed and particularized class complaint. Fleischman Decl., ¶ 25.

Plaintiffs' Counsel reviewed a wide variety of publicly available information, including relevant press releases, financial statements, Securities Exchange Commission (the "SEC") filings, analyst reports and news reports. *Id.*, ¶¶ 25, 26; Fairness Hearing Transcript at 14:10–14. Plaintiffs' Counsel also sought to identify and interview former SCII employees with relevant information. Fleischman Decl., ¶ 26; Fairness Hearing Transcript at 14:14–19. Plaintiffs' Counsel interviewed and consulted with several non-SCII employees familiar with the airbag component industry. Fleischman Decl., ¶ 26.

Plaintiffs' Counsel hired a forensic accountant to analyze the available data in order to determine whether SCII's accounting practices violated Federal securities laws. *Id.*, ¶ 27; Fairness Hearing Transcript at 7:6–8. Lead Plaintiffs allege that the forensic accountant helped identify precisely the nature of the accounting improprieties that resulted in the false and misleading nature of the public statements of SCII. Fleischman Decl., ¶ 27; Fairness Hearing Transcript at 15:24–25. Lead Plaintiffs further allege that the forensic accountant assessed the possible liability of Arthur Andersen, as a result of its audits of the SCII financial statements for 1998 and 1999. Fleischman Decl., ¶ 27.

Following the initial investigation, Lead Plaintiffs filed the Complaint on or about 21 March 2000. *Id.*, ¶ 28. Lead Plaintiffs allege that Plaintiffs' Counsel continued to investigate during the pendency of the action. *Id.*, ¶ 29. Plaintiffs' Counsel ob-

---

**2.** *Waters v. Safety Components, Inc., et al.*, No. 99–5316, filed on 12 November 1999, was the first of the Individual Actions. It was originally assigned to Judge Bassler, but was reassigned to Judge Hochberg on 16 December 1999. The second action, *Tylka v. Safety Components, Inc., et al.*, No. 99–5502, was filed 23 November 1999 and was originally assigned to the undersigned. *Mahler v. Safety Components, Inc., et al*, No. 99–5563, filed on 29 November 1999, was originally assigned to Judge Bassler. *Bozman v. Safety Components, Inc., et al.*, No. 99–5587, filed 30 November 1999, was also originally assigned to Judge Bassler. *Giannantonio v. Safety Components, Inc., et al.*, No. 99–5604, was filed on 1 December 1999 and was originally assigned to Judge Politan. *Dale v. Safety Components, Inc., et al.*, No. 99–5723, filed on 7 December 1999, was also originally assigned to Judge Politan. *Duncan v. Safety Components, Inc., et al.*, No. 99–5984, was filed on 17 December 1999 and was originally assigned to Judge Greenaway. *Patel v. Safety Components, Inc., et al.*, No. 00–0082, was filed on 7 January 2000 and was originally assigned to Judge Hochberg.

By order on or about 17 February 2000, all of the Individual Actions were transferred to the undersigned, with the exception of *Tylka*, which had been previously allocated to the undersigned. On or about 25 February 2001, all the Individual Actions were consolidated into the pending matter. 25 February 2000 Consolidation Order at 2. *Patel*, No. 00–0082, was established as the master file for the consolidated matter. *Id.* at 2. All of the Individual Actions, with the exception of *Patel*, were then closed on 29 February 2000.

tained and analyzed all publicly available information, including records of court, SEC proceedings, the quarterly and annual SEC filings of SCII, analyst reports, and SCII press releases. *Id.*

### C. *Reaction to the Complaint*

On 3 April 2000, Defendants informed Plaintiffs' Counsel by letter of their intention to file a motion to dismiss the Complaint (the "Motion to Dismiss"). *Id.,* ¶ 30. The Defendants intended to argue in the Motion to Dismiss that (1) the Complaint did not adequately plead scienter, (2) the Complaint improperly lumped all the Defendants together, (3) facts alleged as omitted were actually disclosed, (4) the Complaint improperly attempted to convert "mismanagement" claims into "fraud" claims, (5) no claims could be stated based upon forward-looking statements, (6) the Complaint did not adequately allege claims "on information and belief," and (7) the Complaint did not adequately allege causation. *Id.,* ¶ 30. Although the Defendants never filed the Motion to Dismiss, Plaintiffs' Counsel assert they were prepared to respond to each argument raised by the Defendants. *Id.,* ¶ 31.

Following the investigative efforts of Plaintiffs' Counsel, the Proposed Amended Complaint was drafted; it would have further alleged that Arthur Andersen violated Federal securities laws in connection with its audits of the financial statements of SCII for the fiscal years 1998 and 1999. *Id.,* ¶ 32. As mentioned, the Proposed Amended Complaint was not filed. *Id.* Arthur Andersen informed Lead Plaintiffs that it would assert numerous defenses to the Proposed Amended Complaint, including a statute of limitations defense and a defense on the merits. *Id.,* ¶ 33.

### D. *Informal Discovery, Negotiation and Settlement*

Settlement discussions commenced after the filing of the Complaint and the parties were able to reach an agreement before the commencement of formal discovery. Fleischman Decl., ¶ 35; Fairness Hearing Transcript at 5:9–13. Prior to the Settlement, Lead Plaintiffs interviewed many former employees of SCII. Fleischman Decl., ¶ 39; Fairness Hearing Transcript at 14:14–15. Plaintiffs' Counsel also requested, and received, from the Defendants various documents relevant to the reasonableness of any proposed settlement. Fleischman Decl., ¶ 39; *see also* Stipulation and Agreement of Settlement, dated 16 April 2001 (the "Stipulation of Settlement"), at 3. These documents included, *inter alia,* minutes of SCII board meetings during the Class Period, written consents relating to the Class Period, and documents related to the 22 May 1997 purchase agreement entered into in connection with the Transaction. *Id.* Plaintiffs' Counsel also interviewed Zummo prior to the Settlement. *Id.*

Following the preliminary agreement to settle, the parties began negotiations of a draft stipulation of settlement. *Id.,* ¶ 40. The drafting period lasted several weeks, during which the draft stipulation underwent many changes. *Id.* The Stipulation of Settlement was entered into by the Lead Plaintiffs, the Defendants and Arthur Andersen on or about 16 April 2000. *Id.;* Stipulation of Settlement at 1. Pursuant to the Stipulation of Settlement, $4,500,000 has been deposited by the Defendants and Arthur Andersen into an interest-bearing escrow account for the benefit of the plaintiff class (the "Settlement Fund").[3] Fleischman Decl., ¶ 40; Stipula-

---

**3.** The Defendants, pursuant to the Stipulation of Settlement, contributed $4,000,000 to the

Settlement Fund. Stipulation of Settlement at 13. Arthur Andersen, pursuant to the Stipu-

tion of Settlement at 13. The proposed plan of allocation mandates that each Class Member who files an acceptable proof of claim will receive a *pro rata* share of the Settlement Fund. Memorandum in Support of the Settlement at 26.

### E. *Class Certification and Notice of the Settlement*

By way of the 10 May 2001 Order, the Settlement was preliminarily approved and this matter was certified to proceed as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. 10 May 2001 Order at 1–2; Fleischman Decl., ¶ 44. The class was defined as "all persons who purchased the common stock of SCII during the period between May 28, 1997 and April 10, 2000, inclusive" (the "Class"). 10 May 2001 Order at 2; Fleischman Decl., ¶ 42. The 10 May 2001 Order excluded from the Class (1) the Defendants and Arthur Andersen, (2) the heirs and member of the immediate family of any [I]ndividual [D]efendant, (3) the subsidiaries, affiliates, officers and directors of SCII, (4) the partners, principals and employees of Arthur Andersen, and (5) the successors and assignees of any Defendant or Arthur Andersen. 10 May 2001 Order at 2; Fleischman Decl., ¶ 42.

The 10 May 2001 Order scheduled a hearing on the fairness of the Settlement (the "Fairness Hearing") for 14 September 2001. *Id.* at 3. The 10 May 2001 Order stated that objections and comments to the Settlement, as well as any requests to opt-out of this class action, had to be filed no later than 14 August 2001. *Id.* at 6, 7. The 10 May 2001 Order also required Lead Plaintiffs to mail a notice of settlement (the "Notice of Settlement") and a proof of claim (the "Proof of Claim") to all mem-

bers of the Class on or before 24 May 2001. *Id.* at 4. On 24 May 2001, Lead Plaintiffs mailed 4,430 copies of the Notice of Settlement and the Proof of Claim to all those members of the Class who could be identified on or before that date. Fleischman Decl., ¶ 44; Garr Aff., ¶ 3. A summary notice of the pendency of the class action (the "Summary Settlement Notice") was also published in the national edition of *The Wall Street Journal* on 4 June 2001. Fleischman Decl., ¶ 44; Garr Aff., ¶ 4.

The Notice of Settlement described the Settlement in detail. Fleischman Decl., ¶ 44. The Notice of Settlement also explained that Plaintiffs' Counsel would apply for attorney's fees not to exceed one-third of the Settlement Fund, plus reimbursement of their expenses not to exceed $190,794.63, together with interest from the date the Settlement was funded. *Id.* The Notice of Settlement contained the deadlines for the filing of objections, comments and requests to opt-out. *Id.*

No objections to the Settlement or the Application for Attorneys' Fees were received by the 14 August 2001 deadline or to date. Memorandum in Support of the Settlement at 4; Fairness Hearing Transcript at 4:7–11. Only one request to opt-out of the class action has been received to date. Memorandum in Support of the Settlement at 4; Fairness Hearing Transcript at 4:7–11.

### F. *Fairness Hearing*

On 14 September 2001, the Fairness Hearing was held. At the Fairness Hearing, the approval of the Settlement and the approval of the Application for Attorneys' Fees were considered. The Fairness Hearing was originally scheduled to begin

---

lation of Settlement, contributed $500,000 to the Settlement Fund. As of 28 September 2001, the value of the Settlement Fund is

$4,570,794.63, as a result of accrued interest. Fleischman Decl., ¶ 41.

at 9:00 A.M. Fairness Hearing Transcript at 4:1–2. Counsel for all parties, as well as any objectors, were directed to appear at that time. *Id.* On 11 September 2001, however, the terrorist attack on the World Trade Center and the Pentagon occurred. *Id.* at 4:5–6. Due to the resulting interruption in air and ground travel, counsel were unable to appear at the designated time. *Id.*

As a result, a telephone conference was arranged with counsel on the scheduled hearing date. *Id.* The conference call was conducted from chambers and was delayed until 10:30 A.M. to provide any objectors who were traveling additional time to arrive at Court, or otherwise communicate with the Court. *Id.* at 4:7–8. No class members or objectors arrived at the courthouse, or otherwise communicated with the Court before the commencement of, or during, the telephone conference. *Id.*

At approximately 10:35 A.M., the Fairness Hearing commenced via conference call. *Id.* at 4:2. The Fairness Hearing lasted approximately an hour, during which time the Settlement was thoroughly discussed. Counsel were questioned on the fairness of the Settlement and provided an in-depth response to all matters discussed. At the conclusion of the Fairness Hearing, counsel were requested to provide additional briefing regarding the requested attorneys' fees. *Id.* at 30:9–11.

*Discussion*

A. *Approval of the Settlement*

▮▮▮▮ Lead Plaintiffs seek final approval of the Settlement as agreed to in the Stipulation of Settlement, signed 16 April 2001. Memorandum in Support of the Settlement at 1. Federal Rule of Civil Procedure 23(e) provides the basic framework for approval of a class action settlement. Fed. R. Civ. Pro. 23(e). The Rule provides: "A class action shall not be dis-

missed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." *Id.* This rule requires a court to " 'independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished.' " *In re Cendant Corp. Litig.,* 264 F.3d 201, 231 (3d Cir.2001) (quoting *In re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liability Litig.,* 55 F.3d 768, 782 (3d Cir.1995)). In conducting this inquiry, "the District Court acts as fiduciary guarding the rights of absent class members, and must determine that the proffered settlement is 'fair, reasonable, and adequate.' " *Id.* (quoting *In re General Motors,* 55 F.3d at 782).

▮▮▮ Determining whether a settlement is fair, reasonable and adequate requires the application of the nine-factor test articulated in *Girsh v. Jepson,* 521 F.2d 153 (3d Cir.1975). *Id.* (citing *Girsh,* 521 F.2d at 157); *see e.g. Lazy Oil Co. v. Witco Corp.,* 166 F.3d 581, 588 (3d Cir. 1999) (court appropriately analyzed the settlement under the *Girsh* factors). The nine *Girsh* factors are:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery; and

(9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.

*Girsh* 521 F.2d at 157; *In re Cendant,* 264 F.3d at 232. The proponents of a settlement bear the burden of demonstrating that the *Girsh* factors weigh in favor of approval of the settlement. *In re Cendant,* 264 F.3d at 264; *In re General Motors,* 55 F.3d at 785.

■ The Circuit has explained that "[i]n order for the determination that the settlement is fair, reasonable, and adequate to survive appellate review, the [D]istrict [C]ourt must show it has explored comprehensively all relevant factors." *Lazy Oil,* 166 F.3d at 588. However, "[t]he decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the [D]istrict [C]ourt." *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283, 317 (3d Cir.1998). In general, an award of attorneys' fees will be reviewed "for an abuse of discretion, although there are clear error and plenary aspects in a review including examination of factual findings and legal conclusions." *Zucker v. Westinghouse Elec. Corp.,* 265 F.3d 171, 178 (3d Cir.2001) (examining an award of attorneys' fees in a derivative suit).

1. *The First Girsh Factor: Complexity, Expense & Likely Duration of Litigation*

■ The first factor to be considered under the *Girsh* analysis is "the complexity, expense and likely duration of the litigation." *Girsh,* 521 F.2d at 157; *see also In re Cendant,* 264 F.3d at 232; *In re Prudential Ins.,* 148 F.3d at 317. This factor "captures the probable costs, in both time and money, of continued litigation."

*In re Cendant,* 264 F.3d at 264. Examining the costs "of continuing on the adversarial path, a court can gauge the benefit of settling the claim amicably." *In re General Motors,* 55 F.3d at 812.

This factor weighs strongly in favor of approval of the settlement as to both the Defendants and Arthur Andersen. As Lead Plaintiffs explained, absent settlement, Plaintiffs' Counsel likely would have had to defeat not one, but two motions to dismiss—one from the Defendants and one from Arthur Andersen. Fleischman Decl., ¶¶ 31, 34; Memorandum in Support of the Settlement at 14; Fairness Hearing Transcript at 19:21–23. The Defendants had already informed Lead Plaintiffs that the Defendants were prepared to argue numerous grounds for dismissal. Fleischman Decl., ¶ 30. Arthur Andersen had also indicated that it would argue several defenses in a motion to dismiss. *Id.*

If Lead Plaintiffs defeated both motions to dismiss, they would then have faced the task of obtaining class certification. Fairness Hearing Transcript at 19:21–23. This would have resulted in additional motion practice and likely require the depositions of the class representatives. Memorandum in Support of the Settlement at 15.

Expensive and exhaustive discovery would have ensued if litigation of this matter continued. *Id.* Substantial document production would have been required, necessitating the continued employment of an accounting expert, as well as an expert in the airbag industry. *Id.* at 15–16. A significant number of depositions would have been necessary given the allegations of fraud and knowledge of Valentec's financial difficulties. *Id.* at 15. It is likely each of the Individual Defendants would have been deposed to explore his or her knowledge of the facts underlying the Transaction. *Id.* Other SCII personnel would have been deposed to determine

whether the Individual Defendants concealed material information from the rest of SCII. *Id.* Depositions of Arthur Andersen employees would have been required to ascertain Arthur Andersen's knowledge of the alleged violations. *Id.;* Fairness Hearing Transcript at 21:11–16.

It also appears there was the strong possibility that some or all of the Defendants and Arthur Andersen would have moved for summary judgment at some later point. Memorandum in Support of the Settlement at 16. Lead Plaintiffs speculate that trial on the issue of liability alone would have taken several weeks, requiring the introduction of vast amounts of documentary evidence, deposition testimony, and expert testimony. *Id.;* Fairness Hearing Transcript at 17:9–14.

At the Fairness Hearing, Plaintiffs' Counsel argued that this matter is more complex than the "normal" Rule 10b–5 class action. Fairness Hearing Transcript at 7:1–4. Plaintiffs' Counsel represented that SCII had several military contracts that required the application of special accounting rules. *Id.* at 8:5–7. Plaintiffs' Counsel also explained that the military accounting required for these contracts is an arcane subset of GAAP and would present particular difficulties in its presentation. *Id.* at 9:10, 11:12–23.

In addition to the inherent complexity of litigating a class action alleging Federal securities laws violations, this matter became more complex due to the fact that SCII filed for bankruptcy under Chapter 11 of the Bankruptcy Code. Fleischman Decl., ¶ 24; Fairness Hearing Transcript at 26:7–9. SCII's pending bankruptcy petition would have added further procedural hurdles; Plaintiffs' Counsel would have had particular difficulty overcoming the automatic stay imposed by the bankruptcy proceeding. Fleischman Decl., ¶ 24; Fairness Hearing Transcript at 26:7–9.

There would have been additional complexity with regard to proving liability on the part of Arthur Andersen. Fairness Hearing Transcript at 20:15–16. Arthur Andersen would have had the defense that SCII withheld relevant information. *Id.* at 20:19–25. Plaintiffs' Counsel represented that this is a strong defense that is usually available to outside auditors. *Id.* Plaintiffs' Counsel likely would have encountered difficulty demonstrating scienter vis-a-vis Arthur Andersen given this defense. *Id.* at 21:5–10. As well, it appears that Arthur Andersen would have asserted a defense based upon the applicable statute of limitations. Fleischman Decl., ¶ 33; Fairness Hearing Transcript at 20:11–12. Responding to this defense would have required additional motion practice, increasing the expenses and duration of the litigation. Fleischman Decl., ¶ 33; Fairness Hearing Transcript at 20:11–12.

Accordingly, the complex nature of this matter and the delays and expenses resulting from continued litigation weigh strongly in favor of approval of the Settlement as to the Defendants and as to Arthur Andersen. *See e.g. In re Computron Software, Inc. Sec. Litig.,* 6 F.Supp.2d 313, 317 (D.N.J.1998) ("even if the Plaintiff Class were to recover a larger judgment at trial, which is not guaranteed, the additional delay caused by a trial, post-trial motions and the appellate process, would delay recovery for years").

### 2. *The Second Girsh Factor: Reaction of the Class*

The second *Girsh* factor is "the reaction of the class to the settlement." *Girsh,* 521 F.2d at 157. This factor "attempts to gauge whether members of the class support the settlement." *In re Prudential Ins.,* 148 F.3d at 318. To evaluate the reactions of the class to the terms of the Settlement, "the number and vocifer-

ousness of the objectors" must be examined. *In re General Motors*, 55 F.3d at 812. It is generally assumed that " 'silence constitutes tacit consent to the agreement.' " *Id.* (quoting *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1313 n. 15 (3d Cir.1993)).

Consideration of the practical realities of class actions, however, "has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement." *Id.* (citing *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217–18 (5th Cir.1981); *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1137 (7th Cir.1979)).

In securities class actions, the Circuit has "recognized the possibility that the assumption that silence constitutes tacit consent 'understates potential objectors.' " *Id.* (quoting *Bell Atlantic*, 2 F.3d at 1313 n. 15). This potential understatement arises from the fact that "many shareholders have small holdings or diversified portfolios, . . . and thus have an insufficient incentive to contest an unpalatable settlement agreement because the cost of contesting exceeds the objector's pro rata benefit." *Id.* (quoting *Bell Atlantic*, 2 F.3d at 1313 n. 15).

As mentioned, no objections to the Settlement have been received to date. Memorandum in Support of the Settlement at 4; Fairness Hearing Transcript at 4:10. Also, only one request to opt-out of the class action has been received. Memorandum in Support of the Settlement at 4; Fairness Hearing Transcript at 4:10. This follows a notice procedure in which 4,430 copies of the Notice of Settlement were mailed and the Summary Settlement No-

tice was published in *The Wall Street Journal.* Garr Aff. ¶¶ 4,6; Fleischman Decl., ¶ 44. Accordingly, silence on the part of the class weighs in favor of the Settlement. Lead Plaintiffs argued that "[t]he absence of any objections to the Settlement strongly evidences that the terms of the Settlement are fair and reasonable and should be approved." Memorandum in Support of the Settlement at 18. In light of the admonitions of the Circuit with regard to this factor, however, Lead Plaintiffs' assertion may exaggerate the significance of the silence of the Class. Nonetheless, the lack of objection supports a determination of fairness.[4] Because the Notice of Settlement addressed the contributions to the Settlement Fund of the Defendants and Arthur Andersen, this analysis applies equally to both.

### 3. *The Third Girsh Factor: The Stage of Proceedings*

 The third *Girsh* factor is "the stage of the proceedings and the amount of discovery completed." *Girsh*, 521 F.2d at 157. This factor "captures the degree of case development that class counsel have accomplished prior to settlement." *In re Cendant*, 264 F.3d at 235. Through this inquiry, it can be determined whether "counsel had an adequate appreciation of the merits of the case before negotiation." *In re General Motors*, 55 F.3d at 813. To guarantee a proposed settlement is the result of informed negotiations, "there should be an inquiry into the type and amount of discovery the parties have undertaken." *In re Prudential Ins.*, 148 F.3d at 319.

The stage of the proceedings are measured "by reference to the commencement

---

4. As of the date of the Fairness Hearing, 378 Proofs of Claim had been received by Plaintiffs' Counsel. Fairness Hearing Transcript at 27:7. Plaintiffs' Counsel argued that this is further evidence of class support for the Settlement. *Id.* Given that the number of Proofs of Claim constitutes less than 10% of the notices mailed, this assertion is unpersuasive.

of proceedings either in the class action at issue or some related proceeding." *In re General Motors,* 55 F.3d at 813. This matter was commenced 12 November 1999, when the first of the Individual Actions was filed. Fleischman Decl., ¶ 11. The other Individual Actions were then filed between November 1999 and January 2000. *Id.* The Complaint was filed on 21 March 2000. *Id.,* ¶ 12. Litigation relating to this matter, therefore, has been underway for approximately twenty-two months. *Id.,* ¶ 12.

Lead Plaintiffs argue that before the filing of the Individual Actions, "[P]laintiffs' [C]ounsel conducted an extensive investigation of the underlying facts of this litigation." Fleischman Decl., ¶¶ 25,26; *see also* Fairness Hearing Transcript at 14:10–19. Such investigation included a review of SCII press releases, financial statements, SEC filings, analyst reports and news reports. Fleischman Decl., ¶¶ 25, 26; Fairness Hearing Transcript at 14:10–19. "[P]laintiffs' [C]ounsel engaged in an extensive private investigation that included efforts to identify and locate former employees of SCII who might have pertinent information, interviewing a number of former employees and interviewing and consulting with other people familiar with the airbag industry." Fleischman Decl., ¶ 26; *see also* Fairness Hearing Transcript at 14: 10–19. Plaintiffs' Counsel represented that more than fifty former employees of Valentec and SCII were interviewed during informal discovery. Fairness Hearing Transcript at 14:14.

It is further asserted that "Plaintiffs' [C]ounsel also engaged the services of a forensic accountant for the purposes of analyzing the available materials and determining whether [SCII] had engaged in securities laws violations." Fleischman Decl., ¶ 27; Fairness Hearing Transcript at 14:24–25. Moreover, "[t]hroughout the course of the case, [P]laintiffs' [C]ounsel continually sought, obtained and analyzed publicly available information by or about SCII." Fleischman Decl., ¶ 29; *see also* Fairness Hearing Transcript at 14:24–25.

It appears this matter had been in progress for a considerable amount of time and a significant amount of informal discovery and factual analysis has taken place. It further appears, however, that there has been no formal discovery undertaken during this extended period. Moreover, with the exception of a motion to consolidate, filed 18 January 2000 (the "Motion to Consolidate"), there has been no motion practice during the twenty-two months of the pendency of this action. In *Prudential Ins.,* the District Court, as support for approval of the settlement, stated:

> [C]ounsel for plaintiffs and Prudential did not commence serious settlement discussions until 18 months of "vigorous litigation had transpired," noting the parties had filed and argued a multitude of motions, including consolidation motions, jurisdictional motions, motions to stay competing class actions, case management motions and Prudential's motion to dismiss . . . . In addition to its in-court efforts, the district court concluded that class counsel's pursuit of discovery also supported the settlement. The court found class counsel reviewed a multitude of documents provided by Prudential, conducted its own interviews with hundreds of current and former Prudential employees, took twenty depositions, and had access to all of the materials collected by the Task Force.

*In re Prudential Ins.,* 148 F.3d at 319. In contrast, it appears there has been no evidence of such litigation of the present matter. Though Plaintiffs' Counsel appear to have spent considerable time conducting factual investigation, such informal inquiry necessarily has limitations.

Formal discovery would have allowed Lead Plaintiffs to depose the Individual Defendants and other pertinent SCII employees. Lead Plaintiffs would also have gained access to nonpublic SCII documents. Such additional investigation might have provided Plaintiffs' Counsel with vast amounts of relevant information, thus strengthening the plaintiffs' case. On the other hand, SCII was in bankruptcy and had no assets with which to pay the legal fees related to this litigation. Fleischman Decl., ¶ 49; Fairness Hearing Transcript at 23:7–10. All legal fees in connection with this matter and the bankruptcy proceeding would have been paid from the directors and officers insurance policy (the "D & O Policy"). Fleischman Decl., ¶ 49; Fairness Hearing Transcript at 23:7–10. The D & O Policy is a wasting asset that would have been progressively depleted by continued discovery. Fleischman Decl., ¶ 49; Fairness Hearing Transcript at 23:7–10. The D & O Policy is, and would likely remain, the sole source of funds available to the Defendants to honor a judgment. Fairness Hearing at 25:24–25. Accordingly, while continued litigation would have given Plaintiffs' Counsel a better sense of the case, the additional expenses would have diminished the funds available to satisfy a judgment.

Settlement at an early stage, therefore, is a double-edged sword, in that litigation expenses are avoided, but the risks of failing to discover pertinent information are present. By conducting discovery and proceeding with motion practice, counsel obtain a better vision of the strength of a case, but risk accusations of wasting resources and running up fees. Because the D & O Policy in this case is a wasting asset that would be diminished through the payment of legal fees, continued litigation would decrease the amount of an award that could be funded by the D & O Policy. Fairness Hearing Transcript at

23:7–10. This danger is increased by the fact that SCII, as mentioned, is in bankruptcy. Fleischman Decl., ¶ 49; Fairness Hearing Transcript at 25:24–25. As previously discussed, SCII has no assets; the D & O Policy, a wasting asset, is the only source of funds for both the payment of legal fees and the financing of any settlement or judgment. Fleischman Decl., ¶ 49; Fairness Hearing Transcript at 25:24–25.

Plaintiffs' Counsel represented that the investigation in this matter was "close in time to the events and facts underlying the lawsuit, allow[ing][P]laintiffs' [C]ounsel to obtain information that might have taken years and a large expenditure of money and attorney's time to obtain through formal discovery." Supplemental Memorandum at 10. Plaintiffs' Counsel argued that this

use of an aggressive and thorough investigation at the earliest part of this case in conjunction with the intensive use of experts in forensic accounting to process the facts of the investigation and formulate those facts into a powerful amended complaint were the driving factors that led to a settlement of the cases before the filing of a motion to dismiss, as well as [SCII's] imminent Chapter 11 Bankruptcy filing.

*Id.* It appears that all counsel in this matter acted efficiently in reaching a settlement quickly. Accordingly, this factor favors approval of the Settlement as to the Defendants.

The proceedings were at an even earlier stage regarding Arthur Andersen. Plaintiffs' Counsel had drafted, but not yet filed, The Proposed Amended Complaint that would have named Arthur Andersen as a defendant. Fleischman Decl., ¶ 32. Arthur Andersen was not, and is not, a formal party to this litigation. Fairness

Hearing Transcript at 20:7–8. As with the Defendants, Plaintiffs' Counsel had conducted extensive informal investigation of Arthur Andersen's involvement. Fairness Hearing Transcript at 21:1–10. Regarding Arthur Andersen, Plaintiffs' Counsel did not face a scenario in which continued litigation would deplete a limited source of funds. *Id.* at 22:7–10. Arthur Andersen, in fact, had significant resources with which to pay legal fees and satisfy any judgment. *Id.* Accordingly, this factor weighs only slightly in favor of approval as to Arthur Andersen.

4. *The Fourth Girsh Factor: The Risks of Establishing Liability*

 The fourth factor for consideration under the *Girsh* analysis is "the risks of establishing liability." *Girsh*, 521 F.2d at 157. This factor is considered in order to "examine what the potential rewards (or downsides) of litigation might have been had class counsel decided to litigate the claims rather than settle them." *In re Cendant*, 264 F.3d at 236–37. The inquiry requires a balancing of the likelihood of success if "the case were taken to trial against the benefits of immediate settlement." *In re Prudential Ins.* 148 F.3d at 319. This factors weighs in favor of approving the Settlement as to the Defendants and as to Arthur Andersen.

 From the submissions, it appears Lead Plaintiffs would have faced risks in establishing liability in this matter. To establish a violation of Rule 10b–5, Lead Plaintiffs would have had to prove that the Defendants (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which plaintiffs relied, and (5) that plaintiffs' reliance was the proximate cause of their injury. *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 871 (3d Cir.

2000); *Kline v. First Western Gov't Sec., Inc.*, 24 F.3d 480, 487 (3d Cir.1994); *see also In re Milestone Scientific Sec. Litig.*, 103 F.Supp.2d 425, 452 (D.N.J.2000). The scienter element of a Rule 10b 5 violation requires either knowing or reckless misconduct. *SEC v. The Infinity Group Co.*, 212 F.3d 180, 192 (3d Cir.2000); *SEC v. Antar*, 15 F.Supp.2d 477, 529 (D.N.J.1998) (citing *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1243 (3d Cir.1989)). Moreover, the Circuit has adopted the following standard for recklessness under Rule 10b–5:

> [H]ighly unreasonable (conduct), involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*The Infinity Group Co.*, 212 F.3d at 192; *see also In re Ikon Office Solutions, Inc. Sec. Litig.*, 131 F.Supp.2d 680, 692 (E.D.Pa.2001) (quoting *Healey v. Catalyst Recovery of Penn.*, 616 F.2d 641, 649 (3d Cir.1980)) (stating that the recklessness standard in Rule 10b–5 cases is " 'relatively close to intentional conduct' ").

If this matter were to proceed, it appears Lead Plaintiffs likely would have had difficulty establishing the elements of a Rule 10b–5 violation, Fairness Hearing Transcript at 16:19–22, including the scienter element. *Id.* at 17:3–5. The Defendants, in fact, indicated that they would seek dismissal, *inter alia*, on the grounds that the alleged fraud was nothing more than mismanagement. Fleischman Decl., ¶ 30. Lead Plaintiffs would have encountered obstacles in proving that the Defendants knew of the financial difficulties of Valentec. *See* Fleischman Decl., ¶ 23. Establishing that, with such knowledge,

the Defendants actively concealed the financial condition of Valentec would have also posed a hurdle to Plaintiffs' Counsel. *See id.*

Plaintiffs' Counsel represented that Zummo in particular had been adamant in his denial of knowledge of the allegedly misrepresented and fraudulent facts. Fairness Hearing Transcript at 18:18–20. Zummo had gone so far as to reserve, in the Stipulation of Settlement, his right to proceed against Arthur Andersen. Stipulation of Settlement at 8–9; Fairness Hearing Transcript at 18:20–24. Accordingly, this factors weighs in favor of approving the Settlement as to the Defendants.

Lead Plaintiffs would have faced additional risks in establishing the liability of Arthur Andersen. Fairness Hearing Transcript at 20:11–17. Arthur Andersen had stated that it would argue, *inter alia,* that any claim of liability is barred by the statute of limitations. Fleischman Decl., ¶ 34. Furthermore, it appears Arthur Andersen would have had a strong defense to scienter. Fairness Hearing at 20:19–20. Arthur Andersen, as outside auditor of SCII, would have been able to assert that SCII withheld relevant information. *Id.* at 20:19–25. In fact, Plaintiffs' Counsel represented that it interviewed a individual who provided uncorroborated statements that he witnessed the destruction of audit materials prior to the review by Arthur Andersen. *Id.* at 21:18–22. The fourth *Girsh* factor, therefore, strongly weighs in favor of approving the Settlement as to Arthur Andersen.

### 5. The Fifth Girsh Factor: The Risk of Establishing Damages

The Fifth *Girsh* factor to be analyzed when considering the fairness of a settlement is "the risk of establishing damages." *Girsh,* 521 F.2d at 157. Similar to the fourth, this factor "attempts to measure the expected value of litigating the action rather than settling it at the current time." *In re Cendant,* 264 F.3d at 239. To the extent that establishing damages is contingent upon liability, many of the same risks discussed in the previous section are also present here. As well, Lead Plaintiffs, assuming the establishment of liability, would have faced the problem of demonstrating which percentage of the drop in SCII stock price was attributable to the misconduct of the Defendants, as opposed to other market conditions. Fairness Hearing Transcripts at 18:1–5.

To establish damages, Plaintiffs' Counsel would have had to employ complex models and formulae. *Id.* at 18:1–5. These models and formulae would have had to be explained by expert witnesses. Memorandum in Support of the Settlement at 22. The Defendants likely would have employed their own experts to attack the accuracy and reliability of the models and formulae utilized by Plaintiffs' Counsel. Fairness Hearing Transcript at 18:1–5. It is likely the experts of the Defendants, in addition, would have asserted that no actual damages resulted from the alleged violations. Memorandum in Support of the Settlement at 22. It appears that many risks would have faced Lead Plaintiffs in establishing damages. Fairness Hearing Transcripts at 18:1–5. Accordingly, this factor weighs in favor of approving the Settlement as to the Defendants. Given the increased risks discussed in the previous section, this factors weighs strongly in favor of approval as to Arthur Andersen.

### 6. The Sixth Girsh Factor: The Risks of Maintaining the Class Action Through Trial

The Sixth *Girsh* factor is "the risks of maintaining the class action through the trial." *Girsh,* 521 F.2d at 157. The Cir-

cuit has explained that "[t]he value of a class action depends largely on the certification of the class because, not only does the aggregation of the claims enlarge the value of the suit, but often the combination of the individual cases also pools litigation resources and may facilitate proof on the merits." *In re General Motors Corp.*, 55 F.3d at 817. The prospects of obtaining and maintaining class certification, therefore, have a "great impact on the range of recovery one can expect to reap from the action." *Id.*

In *In re Prudential Ins.*, however, the Circuit stated that "[b]ecause the district court always possesses the authority to decertify or modify a class that proves unmanageable, examination of this factor in the standard class action would appear to be perfunctory." *In re Prudential Ins.*, 148 F.3d at 321. The Circuit explained that "[t]here will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement." *Id.*

The *Prudential Ins.* court determined that this factor "becomes even more 'toothless' after [*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) ]." *Id.* The Circuit explained that *Amchem* held that, when "[c]onfronted with a request for settlement-only class certification, a [D]istrict [C]ourt need not inquire whether the case, if tried, would present intractable management problems." *Id.* (citing *Amchem Prods.*, 521 U.S. at 620, 117 S.Ct. 2231). The manageability inquiry in settlement-only class actions, the Circuit posited, may not be significant. *Id.* This matter was certified as a class action for settlement purposes on 10 May 2001. 10 May 2001 Order at 2. Accordingly, this factor adds little to the consideration of the fairness of the Settlement.

### 7. *The Seventh Girsh Factor: The Ability of Defendants to withstand a greater judgment*

The seventh *Girsh* factor is "the ability of the defendants to withstand a greater judgment." *Girsh*, 521 F.2d at 157. This factor "is concerned with whether the defendants could withstand a judgment for an amount significantly greater than the Settlement." *In re Cendant*, 264 F.3d at 240.

This factor weighs overwhelmingly in favor of approval as to the Defendants. As noted previously, SCII filed for Chapter 11 bankruptcy on 10 April 2001. Fleischman Decl., ¶ 24; Fairness Hearing at 22:18–19. As a corporation in bankruptcy, SCII presumably has very little available capital. Fleischman Decl., ¶ 49; Fairness Hearing Transcript at 22:18–19; 25:24–25. Even after emerging from reorganization, SCII presumably will operate in a very cash poor state for a considerable period of time. Fleischman Decl., ¶ 49. As such, the ability of SCII to pay any sum over the amount of the Settlement is highly unlikely.

The $4,000,000 contributed to the Settlement Fund by the Defendants was paid from the D & O Policy. Fairness Hearing Transcript at 25:17–20. SCII itself contributed nothing to the Settlement Fund. *Id.* at 25:21–22. The D & O Policy coverage is for a maximum of $5,000,000. *Id.* at 23:19. The Settlement, therefore, constituted four-fifths of the D & O policy. *Id.* at 23:20–21; Supplemental Brief at 13. Moreover, counsel for the Individual Defendants represented at the Fairness Hearing that the D & O Policy underwriter had indicated that it might refuse to pay under the policy on the grounds that the alleged actions constituted fraud and were beyond the scope of coverage. Fairness Hearing Transcript at 23:22–25; 24:1–9. Also, as mentioned, the D & O Policy is a

wasting asset that would be substantially depleted by defense costs if litigation continued. Fleischman Decl., ¶ 49; Fairness Hearing Transcript at 23:7–10. These facts support the conclusion that the Defendants would almost certainly be unable to withstand a greater judgment. Accordingly, this factor weighs overwhelming in favor of approving the Settlement as to the Defendants.

Plaintiffs' Counsel acknowledged that Arthur Andersen could withstand a much larger judgment. Fairness Hearing Transcript at 22:3–6. Plaintiffs' Counsel represented that the risk regarding Arthur Andersen is that it has very substantial resources and would be able to aggressively litigate this matter on all levels. *Id.* at 22:8–9. This factor, therefore, is neutral as to Arthur Andersen.

8. *The Eighth and Ninth Girsh Factors: The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and In Light of Litigation Risks*

The eighth *Girsh* factor is "the range of reasonableness of the settlement fund in light of the best possible recovery." *Girsh*, 521 F.2d at 157. The ninth *Girsh* factor is "the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." *Id.* These two factors "ask whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *In re Prudential Ins.*, 148 F.3d at 322. In conducting this evaluation, it is recognized "that settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution and [courts should] guard against demanding too large a settlement based on the court's view of the merits of the litigation." *In re Aetna Sec.*

*Litig.*, No. MDL 1219, 2001 WL 20928, at *11 (E.D.Pa. Jan. 4, 2001).

The "primary touchstone of this inquiry is the economic valuation of the proposed settlement." *Id.* This inquiry usually requires "the present value of the damages plaintiff would likely recover if successful, appropriately discounted for the risk of not prevailing, [to] be compared with the amount of the proposed settlement." *Id.* The Circuit has determined, however, that discounting to present value is not necessary, where "the reasonableness of the settlement [can] be fairly judged." *Id.*

In the present matter, one fact dominates the inquiry of whether the Settlement is within a reasonable range as to the Defendants. The fact that SCII is in bankruptcy proceedings applies severe restraints on the possible range of recovery. As mentioned above, SCII's pending bankruptcy eliminates its ability to pay a greater amount of damages at a later time. Fleischman Decl., ¶ 49.; Fairness Hearing at 22:15–20. It appears that SCII, at the time of negotiation, was insolvent. *Id.*

The D & O Policy, which is funding the entirety of the Defendants' contribution to the Settlement Fund, has, as mentioned, a limit of $5,000,000. Fairness Hearing Transcript at 23:19. As explained, the $4,000,000 contribution already constitutes four-fifths of that policy. *Id.* at 23:20; Supplemental Memorandum at 13. Because that policy is a wasting asset, it is highly unlikely that a substantially higher award could be funded from that source. Fairness Hearing Transcript at 23:20. Plaintiffs' Counsel represented at the Fairness Hearing that their damages study yielded a best-case recovery scenario of roughly $14.7 million. *Id.* at 25:1–2. In light of the limited sources of available funds, however, it appears that Plaintiffs' Counsel would not have been able to exe-

cute on such a sizable judgment, even if awarded.

The risks previously discussed regarding opposing two motions to dismiss and a possible summary judgment motion, as well as the challenge of obtaining class certification, further limit the range of reasonable judgments. Memorandum in Support of the Settlement at 15. In light of SCII's insolvency and the risks associated with litigation of this matter, the Settlement appears to be within the range of reasonableness. Accordingly, the eighth and ninth *Girsh* factors weigh in favor approval of the Settlement as to the Defendants.

As mentioned, Arthur Andersen has considerable resources from which a sizable judgment could be paid. Fairness Hearing Transcript at 22:3–6. Arthur Andersen, however, would also have used those substantial resources to vigorously litigate this matter. *Id.* Furthermore, there would have been additional difficulties associated with establishing liability against Arthur Andersen. *Id.* at 20:17–25. Plaintiffs' Counsel would have faced the previously discussed difficulty of establishing scienter against Arthur Andersen. *Id.* It appears, furthermore, that Arthur Andersen would have had a strong statute of limitations argument. Fleischman Decl., ¶ 34; Fairness Hearing Transcript at 20:11–12. Accordingly, these factors also weigh in favor of approval as to Arthur Andersen.

### 9. *Summary of Girsh Analysis*

In conclusion, as to the Defendants, the second, third, fourth, fifth, eighth and ninth *Girsh* factors weigh in favor of approving the Settlement. The first factor

weighs strongly in favor, while the seventh factor overwhelmingly supports the Settlement. The sixth factor is neutral as to the Defendants. As to Arthur Andersen, the second, eighth and ninth factors weigh in favor of approving the settlement. The first, fourth and fifth factors weigh strongly in favor of approving the settlement. The third factor weighs only slightly in favor of approval as to Arthur Andersen. The sixth and seventh factors are neutral as to Arthur Andersen. These factors are "a guide and the absence of one or more does not automatically render the settlement unfair." *In re Am. Family Enter.,* 256 B.R. 377, 418 (D.N.J.2000). It appears that counsel for all parties have done an admirable job of efficiently negotiating as favorable a settlement as possible in this matter. Accordingly, the Settlement is approved.

### B. *Approval of Attorneys' Fees and Costs*

Lead Plaintiffs seek approval of the Application for Attorney's Fees, which requests fees in the amount of 33 1/3% of the Settlement Fund, or $1,500,000. Memorandum in Support of Application for Attorney's Fees at 4. The Application for Attorneys' Fees also seeks reimbursement of expenses in the amount of $190,794.63. *Id.* at 2. The Application for Attorneys' Fees, in addition, seeks interest on the amount of fees and expenses requested. Fleischman Decl., ¶ 52.

In *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190 (3d Cir.2000), the Circuit set forth the analysis for determining the reasonableness of a percentage fee award.[5] *Id.* at 195 n. 1. The Circuit stated

---

5. There are two primary methods for calculating attorneys' fees: the percentage-of-recovery method and the lodestar method. *In re Cendant,* 264 F.3d at 255–56. The lodestar

method was the device most frequently used at the beginning of the class action era. *Id.* The lodestar method calculates attorneys' fees based on the number of hours reasonably

that in common fund case, where the fees and the award come from the same source and the fees are based on a percentage amount of the clients' settlement, a District Court should first consider several factors in setting a fee award. *Id.* Those factors include:

> (1) the size of the fund created and the number of person benefitted; (2) the presence or absence of substantial objections by members of the class to the . . . fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*Id.* (citing *In re Prudential*, 148 F.3d at 336–340; and *In re General Motors*, 55 F.3d at 819–22). In *Gunter*, the Circuit also instructed that a District Court should "cross-check the percentage award at which [it] arrive[s] against the 'lodestar' award method, which is normally employed in statutory fee-award cases."[6] *Id.*; *see also In re Cendant*, 264 F.3d at 256–57; *In re Prudential*, 148 F.3d at 333. The Circuit explained that these factors "need not be applied in a formulaic way.

Each case is different, and in certain cases, one factor may outweigh the rest." *Gunter*, 223 F.3d at 195 n. 1.

 When considering an award of attorneys' fees, a District Court "should articulate reasons for the selection of the given percentage sufficient to enable a reviewing court to determine whether the percentage selected is reasonable." *Id.* at 196 (internal citation omitted). Moreover, a District Court, "in awarding attorneys' fees, may not reduce an award by a particular percentage of amount (albeit for justifiable reasons) in an arbitrary or indiscriminate fashion." *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). If a fee reduction is deemed appropriate, the court "must analyze the circumstances requiring the reduction and its relation to the fee, and it must make specific findings to support its action." *Id.*

In *Cendant*, the Circuit recently provided further guidance for the assessment of a request for attorneys' fees. 264 F.3d at 283–85. The Circuit explained the *Gunter* analysis must "be modified to take into account some of the changed circumstances brought about by the [Private Se-

---

expended by counsel. *In re Prudential*, 148 F.3d at 331 n. 102.

"The lodestar method is more commonly applied in statutory fee-shifting cases, and is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation." *Id.* at 333. Over time, "criticism mounted against using the lodestar method, especially in 'common fund' cases." *In re Cendant*, 264 F.3d at 255–56.

In response to such criticism, another method has been employed to determine attorneys' fees in common fund cases—the percentage-of-recovery method. *Id.* at 256–57. The percentage-of-recovery method "resem-

bles a contingent fee in that it awards counsel a variable percentage of the amount recovered for the class." *In re General Motors*, 55 F.3d at 819 n. 38. "The percentage-of-recovery method is generally favored in cases involving a common fund, and is designed to allow courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure." *In re Prudential Ins.*, 148 F.3d at 333.

6. *Cendant* stated that the use of the lodestar cross check is not mandatory in determining the reasonableness of a fee award. *In re Cendant*, 264 F.3d at 284–85; *see* discussion *infra*. The Circuit stated, however, that while time consuming, the use of the lodestar device may still be appropriate in certain cases. *Id.* As discussed *infra*, using the lodestar cross check is appropriate in this matter.

curities Litigation Reform Act (the 'PSLRA') ]." *Id.* at 283–84. The Court explained that "the aim in this context is not to assess whether the fee request is reasonable; instead, the goal is to determine whether the presumption of reasonableness has been rebutted."[7] *Id.*

Despite this admonition, the *Cendant* court noted that conducting the full *Gunter* analysis often is still informative. *Id.* at 284 n. 56. The Circuit explained that such an inquiry was warranted in *Cendant PRIDES*, 243 F.3d at 735, because the auction to select lead counsel made that matter an atypical PSLRA case. *Id.* Also, the *Cendant* court noted that a more extensive reasonableness inquiry may have been warranted in *Cendant* because the case was settled at an early stage after little formal discovery.[8] *Id.* at 284. It appears that a full *Gunter* analysis, as modified by the recent guidance provided by *Cendant*, is appropriate in this case.[9] Accordingly, each of the factors set forth in *Gunter* is considered separately, followed by a lodestar cross-check, in determining the appropriate award of attorneys' fees in this case.

1. *Size of Fund and Number of Persons Benefitted*

■■■■■ The first factor to be considered under the *Gunter* analysis is "the size of the fund created and the number of persons benefitted." *Gunter,* 223 F.3d at 195 n. 1. In general, as the size of the

settlement fund increases, the percentage award decreases. *In re Prudential,* 148 F.3d at 339; *see also In re Aetna,* 2001 WL 20928, at *15; *Cullen v. Whitman Med. Corp.,* 197 F.R.D. 136, 148 (E.D.Pa. 2000). The Circuit has explained that the "basis for this inverse relationship is the belief that '[i]n many instances the increase [in recovery] is merely a factor of the size of the class' and has no direct relationship to the efforts of counsel." *In re Prudential Ins.,* 148 F.3d at 339 (internal citations omitted).

For example, in *In re Prudential,* the District Court determined that a reduction was appropriate given that the recovery would equal at least $410 million. *Id.* As mentioned, the Settlement Fund in this matter consists of $4,500,000.00. Fleischman Decl., ¶ 4. This case, therefore, does not involve a settlement award that is so large as to necessitate an automatic reduction in the percentage award. *See In re Prudential,* 148 F.3d at 339; *see also In re Aetna,* 2001 WL 20928, at *15 (finding that $81 million dollar settlement is "smaller than the large settlements for which courts decrease the percentage awarded"); *In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166, 195 (E.D.Pa.2000) (stating that "$100 million seems to be the informal marker of a 'very large' settlement"). This factor weighs in favor of approving the Application for Attorneys' Fees as to the Defendants and Arthur Andersen.

---

7. The Circuit, in *Cendant,* considered the approval of a request for attorneys' fees submitted pursuant to a retainer agreement. 264 F.3d at 283–86. As explained in section B.10 *infra,* the Circuit determined that a fee request so submitted is entitled to a presumption of reasonableness. *Id.* at 283–84. As discussed below, the Application for Attorneys' Fees was also submitted pursuant to a contingent-fee retainer agreement, albeit one that did not fully comply with appropriate requirements.

8. Another factor necessitating a more indepth reasonableness inquiry was the fact that there was no real issue regarding liability in *Cendant. In re Cendant,* 264 F.3d at 283–84.

9. The *Gunter* analysis is also appropriate in light of the "retainer/fee arrangement" presented in this case. *See* section B.10 *infra.*

## 2. Presence or Absence of Substantial Objections

The second *Gunter* factor is "the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel." *Gunter*, 223 F.3d at 195 n. 1. The absence of any objections mitigates against reducing such amounts. *In re Aetna*, 2001 WL 20928, at *15 (holding that the lack of objections to the fee petition supported an award of the fees requested); *see also In re General Motors*, 55 F.3d at 812 (quoting *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1313 n. 15 (3d Cir.1993)) (stating that it is generally assumed that " 'silence constitutes tacit consent to the agreement' "); *Cullen*, 197 F.R.D. at 149 (a lack of objections supported approval of the fee request).

As mentioned, there were no objections to the Settlement or the Application for Attorneys' Fees. Memorandum in Support of the Settlement at 4; Fairness Hearing Transcript at 4:10. Also, there was only one request to opt-out of the class action. Memorandum in Support of the Settlement at 4; Fairness Hearing Transcript at 4:10. In light of the fact that more than 4,400 copies of the Notice of Settlement were mailed and a Summary Settlement Notice was published in *The Wall Street Journal*, Garr Aff. ¶¶ 4,6, the lack of objections to the Settlement or the Application for Attorneys' Fees supports approval of the requested fees.

The previous discussion urging caution when inferring approval from silence, however, is similarly applicable to applications for attorneys' fees. *See In re General Motors*, 55 F.3d at 812; *supra* at 84–85. As with the Settlement, a lack of objection to an application for attorneys' fees may result from the fact that a majority of shareholders have little incentive to challenge a fee award because the cost of objecting would exceed the value of their holdings. *In re General Motors*, 55 F.3d at 812 (quoting *Bell Atlantic*, 2 F.3d at 1313 n. 15).

Accordingly, while silence on the part of the class supports approval of the Application for Attorneys' Fees, this factor weighs only slightly in favor of approval. Because the Notice of Settlement addressed the contributions to the Settlement Fund of the Defendants and Arthur Andersen, this analysis applies equally to both.

## 3. Skill and Efficiency of Attorneys Involved

The third factor delineated in *Gunter* is "the skill and efficiency of the attorneys involved." *Gunter*, 223 F.3d at 195 n. 1. The Circuit has explained that the goal of the percentage fee-award device is to ensure "that competent counsel continue to undertake risky, complex, and novel litigation." *Id.* at 198. The *Cullen* court explained that "[t]he single clearest factor reflecting the quality of class counsels' services to the class are the results obtained." *Cullen*, 197 F.R.D. at 149.

Discussing this factor in *Cendant*, the Circuit observed that the PSLRA confers on lead plaintiffs in securities class actions the ability to select lead counsel. *In re Cendant*, 264 F.3d at 265. As such, the Circuit determined that "courts should employ a deferential standard of review in assessing ... 'the skill and efficiency of the attorneys'[ ] because the PSLRA assumes that properly-selected lead plaintiffs are at least as able to answer those questions as courts." *Id.*

The background, experience and accomplishments of the attorneys who prosecuted this action are summarized in the various attorney affidavits and firm biographies that were submitted with the Application for Attorneys' Fees. The Class

was represented by two firms, acting as co-lead counsel (the "Co–Lead Counsel"). Fleischman Aff., attached as Exhibit A to the Compendium of Counsels' Affidavits, ¶ 2. One firm appointed as Co–Lead Counsel was Milberg, Weiss, Bershad, Hynes & Lerach LLP ("Milberg Weiss"). *Id.* Milberg Weiss represented that it has successfully prosecuted thousands of class action lawsuits, taken the lead role in numerous complex litigations and has been responsible for more than $30 billion in recoveries. *Id.*, Firm Biography, attached as Exhibit 1 to the Fleischman Aff.

The second firm acting as Co–Lead Counsel was Bernstein, Liebhard & Lifshitz LLP ("Berstein Liebhard"). Lifshitz Aff., attached as Exhibit D to the Compendium of Counsels' Affidavits, ¶ 2. Bernstein Liebhard represented that it has been appointed lead counsel in numerous class actions around the country and has actively litigated many actions to successful conclusions. *Id.*, Firm Biography, attached as Exhibit 3 to the Lifshitz Aff.

The firm biographies submitted by both Co–Lead Counsel also list a number a specific cases in which the firms obtained satisfactory outcomes for their clients. Fleischman Decl., Firm Biography; Lifshitz Aff., Firm Biography. A review of the affidavits submitted by the various non-lead counsel also indicate that those firms possessed substantial experience litigating securities class actions. Compendium of Counsels' Affidavits, Exhibits C, E, F, G, H, I and J. There is no question that Plaintiffs' Counsel possessed the requisite skill and experience in the area of securities class actions.

A seemingly excellent result, moreover, was obtained in this matter. Plaintiffs' Counsel obtained a $4,500,000 settlement, which constituted approximately thirty percent of the best-case scenario damages calculated by Plaintiffs' Counsel. Fairness Hearing Transcript at 5:19–21. The $4,000,000 obtained from the Defendants constitutes four-fifths of the funds available under the D & O policy. *Id.* at 23:20. The dominant factor demonstrating that a favorable result was obtained is that the Settlement was obtained in the face of an impending bankruptcy proceeding. Fleischman Decl., ¶ 49; Fairness Hearing Transcript at 25:24–25; *see e.g. Gunter,* 223 F.3d at 198 (fact that defendant was close to insolvency supported approval of fee award). That a settlement was negotiated despite the insolvency of SCII demonstrates the skill of Plaintiffs' Counsel. Moreover, Plaintiffs' Counsel have represented that the D & O Policy underwriter communicated a possible intention to deny payment on the grounds that the alleged fraud was outside the scope of coverage. Fairness Hearing Transcript at 23:22–25, 24:1–3.

Arthur Andersen's agreement to pay $500,000 to the Settlement Fund also indicates that a favorable result was obtained. Stipulation of Settlement at 13. As mentioned, there were significant questions as to whether liability could be imposed on Arthur Andersen. 20:17–25. Arthur Andersen likely would have had numerous defenses, including a statute of limitations defense and a defense that SCII withheld pertinent information. *Id.* It appears that the ability to prove liability vis-a-vis Arthur Andersen was so questionable that Plaintiffs' Counsel initially declined to name Arthur Andersen as a defendant. *Id.*

As mentioned, Plaintiffs' Counsel conducted significant informal factual investigation at a very early stage of this matter. Supplemental Memorandum at 10. Plaintiffs' Counsel argued that "[t]his intensive use of effort and resources at the very beginning of the case was a demonstration

of the skill and efficiency of counsel that provided to the [Lead Plaintiffs] the bargaining strength to settle the case when they learned [SCII] was planning Chapter 11 bankruptcy." *Id.* Plaintiffs' Counsel further argued:

> If [Plaintiffs' Counsel] had chosen to delay the investigation or had forgone the early expense of hiring experts until after the motion to dismiss had been decided, this [S]ettlement may not have happened. The factual and legal and accounting theories alleged in the amended complaint allowed defense counsel to properly evaluate the case at the earliest possible time and put them in a position to give responsible recommendation to their clients.

*Id.* at 10–11. Accordingly, based on the credentials of Plaintiffs' Counsel, the favorable outcome achieved and the deference given to the choice of Lead Plaintiffs, this factor weighs in favor of approving the Application for Attorneys' Fees as to the Defendants and Arthur Andersen.

### 4. *Complexity and Duration of Litigation*

The fourth *Gunter* factor relevant to the approval of an award of attorneys' fees is "the complexity and duration of the litigation." *Gunter*, 223 F.3d at 195 n. 1. The complexity, as discussed above, weighs in favor of the approval of the Application for Attorneys' Fees as to the Defendants and Arthur Andersen. Plaintiffs' Counsel would have faced several obstacles in establishing liability on the part of the Defendants and Arthur Andersen. Fairness Hearing at 16:19–25. Plaintiffs' Counsel would likely have had to defeat two motions to dismiss and two summary judgment motions. Fairness Hearing at 16:19–25; Fleischman Decl., ¶¶ 30, 34; Memorandum in Support of the Settlement at 15. There would also have been significant litigation over the issue of class certifica-

tion. Memorandum in Support of the Settlement at 15. In addition, the fact that SCII filed a Chapter 11 bankruptcy petition significantly increased the complexity of the matter. Fleischman Decl., ¶ 49; Fairness Hearing Transcript at 16:8–12.

Plaintiffs' Counsel contend that several facts would have further increased the complexity of the litigation. Supplemental Memorandum at 11. Plaintiffs' Counsel argue that the fact that the allegations of fraud relate to several transactions rather than a single transaction creates greater difficulty. *Id.* Plaintiffs' Counsel continue that the allegations of several "less than arms length" loans made by SCII would have posed added obstacles to establishing liability. *Id.* Also, the range and variety of the alleged accounting improprieties, Plaintiffs' Counsel assert, would have further complicated the presentation of this case. *Id.* In particular, SCII, as mentioned, had entered into several military contracts. *Id.* It was represented that "[t]he accounting for revenue obtained from military contracts is governed by specialized accounting rules, thus adding another layer of complexity to the case." *Id.* at 12. The complexity of this matter, therefore, weighs in favor of approval of the Application for Attorneys' Fees as to the Defendants and Arthur Andersen.

The duration of this litigation, however, does not as strongly support approval. The matter has existed, from the filing of the first of the Individual Actions through the pendency of the present motions, for roughly twenty-two months. During that period, as previously discussed, Plaintiffs' Counsel has engaged in informal discovery and fact finding. Fleischman Decl., ¶¶ 25, 26; Fairness Hearing Transcript at 14:10–19. Plaintiffs' Counsel stated that it conducted an extensive investigation, including a review of all publicly available information. Fleischman Decl., ¶¶ 25, 26;

Memorandum in Support of the Settlement at 11; Fairness Hearing Transcript at 15:1–15. Plaintiffs' Counsel further represented that more than fifty former employees of Valentec and SCII were interviewed during informal discovery. Fairness Hearing Transcript at 14:14; Supplemental Memorandum at 10; Fleischman Decl., ¶ 25, 26. Plaintiffs' Counsel also hired a forensic accountant to aid in the investigation. Fleischman Decl., ¶ 27.

Despite these efforts, there has been no formal discovery of any kind and no significant motion practice. This is not an instance, despite the lapse between commencement of suit and settlement, where the parties exhausted considerable resources litigating numerous issues and conducting formal discovery. For example, in *Cendant PRIDES*, the Circuit found that the case had not been of sufficient duration to warrant a $19,329,463 fee award. 243 F.3d at 734–35. The Court based this determination, *inter alia,* on the grounds that (1) the case was settled at a very early stage of the litigation, (2) there was a minimal amount of motion practice, (3) discovery was virtually nonexistent—no depositions were taken and no document review was conducted, and (4) counsel spent a relatively small amount of time on this case compared to the amount of time expended in most other large class actions. *Id.; see also In re Medical X–Ray Film Antitrust Litig.,* No. 93–5904, 1998 WL 661515, at *7 (E.D.N.Y. Aug. 7, 1998) ($13.1 million in fees, representing 33 1/3% of settlement fund, were appropriate where counsel "spent several years defeating motions to dismiss and conducting discovery to enable them to adequately assess settlement offers"); *see also In re Aetna,* 2001 WL 20928, at *14 (holding that $81 million fee award, representing 30% of the settlement fund, was appropriate where case was actively litigated for three years

and involved complex issues regarding scienter, causation and damages).

As previously discussed, early settlement is a two-edged sword. Achieving the Settlement at such an early stage saved considerable litigation expenses but risked failing to discover pertinent information, especially in view of the bankruptcy proceeding. Plaintiffs' Counsel argue that the informal investigation undertaken at an early stage resulted in the discovery of information that would have taken considerable time and money to obtain through formal discovery. Supplemental Memorandum at 10. For instance, Plaintiffs' Counsel stated: "Rather than wait for the opening of formal discovery pursuant to the PSLRA (after the resolution of a motion to dismiss) [P]laintiffs' [C]ounsel interviewed approximately 50 former employees, customers or suppliers, and others with first hand knowledge of the facts alleged." *Id.* Plaintiffs' Counsel represent that they "then pieced this information together from its diverse sources and analyzed it working closely with the experts and investigators in this case." *Id.* at 12. Plaintiffs' Counsel maintained that "[s]uch a process, if conducted through formal discovery could have taken years, and would have required Court approval under [Federal Rule of Civil Procedure] 26 to take more than 10 depositions." *Id.* at 12.

Plaintiffs' Counsel contended that it was this use of extensive informal discovery so near the time of the alleged misconduct, as opposed to a delay until formal discovery, that allowed the negotiation of a favorable settlement before the filing of the bankruptcy petition and the accumulation of litigation expenses. *Id.* at 10. Accordingly, while no formal discovery was undertaken in this matter, this factor weighs slightly in favor of approval as to the Defendants and Arthur Andersen. *See In re Sumitomo Copper Litig.,* 74 F.Supp.2d 393, 398–99 (S.D.N.Y.1999) ($32 million in

**100**

fees, representing 27.5% of settlement fund, were appropriate where, among other things, the case involved highly complicated legal and factual issues and uncertain prospects for any recovery); *Gunter*, 223 F.3d at 197 [10] (calling into question District Court's reduction of fee request from 33 1/3% to 18% where litigation appeared relatively complicated).

### 5. Risk of Nonpayment

The fifth factor for consideration under *Gunter* is "the risk of nonpayment." *Gunter*, 223 F.3d at 195 n. 1. In *Gunter*, the Circuit determined that the risk of nonpayment was high because "the defendants were close to insolvency." *Id.* at 199. Likewise, in *Cullen*, the District Court found the risk of nonpayment to be "acute" because the defendant lacked "significant unencumbered hard assets against which plaintiffs could levy had a judgment been obtained". *Cullen*, 197 F.R.D. at 150.

As mentioned, SCII filed for bankruptcy on 10 April 2000. Fleischman Decl., ¶ 24. SCII was, at the time of negotiation, insolvent. Fairness Hearing Transcript at 25:24–25; Supplemental Memorandum at 13. Plaintiffs' Counsel represented that they were able to aggressively negotiate in the face of the impending bankruptcy filing because, as mentioned, so much infor-

mation had been obtained through early, informal investigation. Supplemental Memorandum at 13.

Moreover, it appears that the D & O Policy underwriter may have declined to make any payment under the policy. Fairness Hearing Transcript at 23:22–25. The D & O Policy is also a wasting asset that could have been drastically depleted through continued litigation. *Id.* at 23:7; Supplemental Memorandum at 13. It appears that the D & O Policy could have been further diminished by unrelated claims that may have arisen during the bankruptcy. Supplemental Memorandum at 13. Accordingly, the risk of nonpayment as to the Defendants was substantial, and, therefore, this factors weighs overwhelmingly in favor of approval.

As mentioned, Arthur Andersen has significant assets that could be used to pay a judgment. Fairness Hearing at 22:3–6. Those assets, however, would enable Arthur Andersen to vigorously litigate at every level. Therefore, while there is little risk of nonpayment, this factor is neutral as to Arthur Andersen.

### 6. Amount of Time Devoted to Case by Plaintiffs' Counsel

The Sixth *Gunter* factor is "the amount of time devoted to the case by plaintiffs'

---

**10.** The parties in *Gunter* settled the matter for $9.5 million. *Gunter*, 223 F.3d at 191. Counsel for the plaintiffs sought fees amounting to one-third of the settlement. *Id.* at 193. The District Court approved fees amounting to only 18% of the settlement. *Id.* at 191.

The District Court did not make findings with regard to the complexity and duration of the case. *Id.* at 197. According to the Circuit, the case was

complex ... involving the intersection of federal and state law, common and public law, and more specifically securities law, RICO, oil and gas law, and myriad state law claims. The case was actively litigated for over four-and-a-half years, and Counsel were forced to file motions dealing with,

*inter alia*, class certification, complicated discovery disputes, and the vagaries of RICO statute-of-limitations law. Moreover, according to Counsel's representations, they not only deposed numerous witnesses, but also consulted many experts in the field, and successfully defended against a summary judgment motion that was bolstered by authority from other jurisdictions that apparently supported the defendants' litigation position.

*Id.* at 197. The Circuit stated that the complexity factor weighed in favor of granting the one-third fee request. *Id.* The Circuit, therefore, remanded the matter and instructed the District Court, *inter alia*, to make findings regarding the complexity of the case.

counsel." *Gunter*, 223 F.3d at 195 n. 1. Plaintiffs' Counsel devoted a total of 1507.85 hours to pursuing this litigation. Memorandum in Support of Application for Attorneys' Fees at 25. During the twenty-two months of this litigation, that total number of hours averages out to roughly sixty-nine hours per month. Dividing that figure evenly among the nine plaintiffs law firms that have submitted affidavits in support of the Application for Attorneys' Fees results in less than eight hours per month per law firm. The bulk of the hours billed to this matter, however, have been incurred by Co–Lead Counsel. Fleischman Aff., ¶ 6; Lifshitz Aff., ¶ 6. Co–Lead Counsel expended a combined 1179 hours litigating this matter. Fleischman Aff., ¶ 6; Lifshitz Aff., ¶ 6. This factor, therefore, is neutral as to both the Defendants or Arthur Andersen.

### 7. *Awards in Similar Cases*

The seventh *Gunter* factor is "the awards in similar cases." *Gunter*, 223 F.3d at 195 n. 1. The Circuit has noted that while percentages awarded have varied considerably, most fee awards range "from nineteen percent to forty-five percent of the settlement fund." *In re Cendant PRIDES*, 243 F.3d at 736; *Smith v. First Union Mortgage Corp.*, No. 98–5360, 1999 WL 509967, at *4 (E.D.Pa. July 19, 1999); *In re Computron Software, Inc.*, 6 F.Supp.2d 313, 322 (D.N.J.1998). While "[t]he median in class actions is approximately twenty-five percent, . . . awards of thirty percent are not uncommon in securities class actions." *In re Ikon*, 194 F.R.D. at 194 (citing *Ratner v. Bennett*, No. 92–4701, 1996 WL 243645, at *8 (E.D.Pa. May 8, 1996); *In re Greenwich Pharma. Sec. Litig.*, No. 92–3071, 1995 WL 251293, at *6 (E.D.Pa. April 26, 1995)); *see also In re Aetna*, 2001 WL 20928, at *14 ("[A]wards of thirty percent are commonly awarded in other settlements of securities fraud cases.").

The Circuit has explained, however, "that a[D]istrict [C]ourt may not rely on a formulaic application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case." *In re Cendant PRIDES*, 243 F.3d at 736. "One important consideration is the size of the settlement." *Id.* Moreover, in *In re Cendant*, the Circuit admonished that this factor "may be of limited use, at least in the first generation of [PSLRA] cases." *In re Cendant*, 264 F.3d at 283–84. The Circuit explained that "the PSLRA shifts the entire backdrop against which our fee jurisprudence has developed, and as a consequence, non-PSLRA cases may not be sufficiently 'similar' to provide a meaningful basis for comparison." *Id.*

Nonetheless, consideration of similar awards may shed light on the reasonableness of the fees requested here. The following are examples of fee awards in common fund cases decided over the past few years:

| CASE | PERCENTAGE OF SETTLEMENT | AMOUNT OF FEES |
|---|---|---|
| *In re Aetna, Inc. Sec. Litig.*, No. MDL–1219, 2001 WL 20928 (E.D.Pa. 4 Jan. 2001) | 30% | $24.3 million |
| *Cullen v. Whitman Medical Corp.*, 197 F.R.D. 136 (E.D.Pa. 2000) | 33 1/3% | $2.4 million |
| *Neuberger v. Shapiro*, 110 F.Supp.2d 373 (E.D.Pa.2000) | 33 1/3% | $1.5 million |

| | | |
|---|---|---|
| *In re Sumitomo Copper Litig.*, 74 F.Supp.2d 393 (S.D.N.Y.1999) | 27.5% | $32 million |
| *Kurzweil v. Phillip Morris Co.*, No. 94–2373, 1999 WL 1076105 (S.D.N.Y.30 Nov.1999) | 30 | $37.1 million |
| *In re Medical X–Ray Film Antitrust Litig.*, No. 93–5904, 1998 WL 661515 (E.D.N.Y. 7 Aug. 1998) | 33 1/3% | $13.1 million |
| *Blatt v. Merril Lynch, Pierce, Fenner & Smith, Inc.*, No. 94–2348(JAG) (D.N.J. 4 Mar. 1998) | 33% | $22 million |
| *In re Greenwich Pharmaceutical Sec. Lit.*, No. 92–3071, 1995 WL 251293 (E.D.Pa.26 Apr. 1995) | 33 1/3% | $1.46 million |
| *In re U.S. Bioscience Sec. Litig.*, 155 F.R.D. 116 (E.D.Pa.1994) | 30% | $5.08 million |
| *In re Crazy Eddie Sec. Litig.*, 824 F.Supp. 320 (E.D.N.Y.1993) | 33.8% | $14.2 million |

It appears the percentage requested in the Application for Attorneys' Fees in the instant matter is reasonable when compared to fee awards in other cases. In particular, in *Neuberger v. Shapiro*, 110 F.Supp.2d 373 (E.D.Pa.2000), the award is almost identical to the request here. The percentage in that case, decided after the enactment of the PSLRA, is exactly the same as is requested by Plaintiffs' Counsel. Accordingly, this factor weighs in favor of the Settlement as to the Defendants and Arthur Andersen.

### 8. *Lodestar Cross–Check*

In common-fund cases, the Circuit in *Gunter* has "suggested that it is advisable to cross-check the percentage award counsel asks for against the lodestar method of awarding fees so as to insure that plaintiffs' lawyers are not receiving an excessive fee at their clients' expense." *Gunter*, 223 F.3d at 199 (citing *In re Prudential*, 148 F.3d at 333); *see also In re Cendant PRIDES*, 243 F.3d at 742. Though *Cendant* observed that the lodestar cross check is "very time consuming," the Circuit concluded that the PSLRA does not rule out the use of the device. *In re Cendant*, 264 F.3d at 284–85. The Circuit explained that the PSLRA "focuses on the final amount of fees awarded, not the means by which such fees are calculated." *Id.* (internal citations omitted). Courts, therefore, can still conduct the cross-check where it is deemed necessary, especially where the *Gunter* analysis calls the reasonableness of the award into question. *Id.* Because several of the *Gunter* factors (the second, fourth and sixth as to the Defendants and the second, fourth, fifth and sixth as to Arthur Andersen) are either neutral or only slightly in favor of approval, applying the lodestar cross check in this matter is appropriate.

A court determines "an attorneys' lodestar award by multiplying the number of hours he or she reasonably worked on a client's case by a reasonable hourly billing rate for such services given the geographical area, the nature of the services provided, and the experience of the lawyer." *Gunter*, 223 F.3d at 195 n. 1. To examine the lodestar factor effectively, "a Court should make explicit findings about how much time counsel reasonably devoted to a given matter, and what a

reasonable hourly rate would be for such services." *Id.* at 199–200. A court may then multiply the lodestar calculation to reflect "the risks of nonrecovery, to reward an extraordinary result, or to encourage counsel to undertake socially useful litigation." *In re Aetna*, 2001 WL 20928, at *15; *see also In re Prudential*, 148 F.3d at 340–41. Even if the lodestar method is employed only as a cross check, "courts must take care to explain how the application of a multiplier is justified by the facts of a particular case." *In re Cendant PRIDES*, 243 F.3d at 742 (internal citation omitted).

 In the present matter, Plaintiffs' Counsel argued that the lodestar was $533,672.00. Fleischman Decl., ¶ 54. Plaintiffs' Counsel bases this figure on over 1507.85 hours of time dedicated to this matter.[11] *Id.* The requested fee award of 33 1/3% represents a multiplier of 2.81 (*i.e.*, the requested fee award of $1,500,000.00 was 2.81 times greater than the lodestar amount.)

From a review of the submissions of Plaintiffs' Counsel, the amount of time expended appears to be reasonable. For example, Milberg Weiss, as Co–Lead Counsel had only one associate bill more than bill hours to this matter over the

twenty-two months of its prosecution. Fleischman Decl., Exhibit 1. Milberg Weiss also had only one partner bill more than 100 hours on this matter. *Id.* Bernstein Liebhard had no individual bill more than 120 hours on this matter, and only one partner bill over 100 hours. Lifshitz Aff., Exhibit 1.

Moreover, from a review of the affidavits of Plaintiffs' Counsel, it appears that there was no duplication of efforts necessitating a reduction in the lodestar. *See United States v. Pennsylvania Blue Shield*, 54 F.Supp.2d 410, 415 (M.D.Pa. 1999). For example, Milberg Weiss billed only 11.25 of its total of 825 hours to factual discovery. Fleischman Aff., Exhibit 1. In contrast, the firm represents that it billed 368 hours, or roughly forty-four percent of its total hours, to the drafting of pleadings and the researching and drafting of legal memorandum and motions. *Id.* Bernstein Liebhard likewise represents that it billed a significant portion, twenty-five percent, of its total hours to pleadings, legal memorandum and pre-trial motions.

Non-lead-counsel, for the most part, devoted the majority of their time to factual investigation. For example, of the total hours billed by the law offices of Leo W. Desmond, more than seventy-five percent

11. In calculating the lodestar, Plaintiffs' Counsel employed their current rates as reasonable hourly rates. Supplemental Memorandum at 14. Plaintiffs' Counsel argued that the use of current hourly rates is appropriate to compensate for the delay in payment. *Id.* The Circuit has held that "the lodestar ought to be adjusted to account for the incurred costs of the delay plaintiffs' counsel has undergone in receiving payment." *Keenan v. City of Philadelphia*, 983 F.2d 459, 476 (3d Cir.1992); *see also Doe v. Terhune*, 121 F.Supp.2d 773, 781 (D.N.J.2000). To adjust for delay in payment of attorneys' fees, a court may "(1) base the fee award on the current billing rate or (2) adjust a fee based on historical rates to reflect its present val-

ue." *Doe*, 121 F.Supp.2d at 781 (citing *Keenan*, 983 F.2d at 476 & n. 18; *Blum v. Witco Chem. Corp.*, 888 F.2d 975, 984 & n. 4 (3d Cir.1989)).

Though the Circuit appears to favor adjusting a fee based on historical rates, "[D]istrict [C]ourts in this [C]ircuit do award attorneys' fees based on the current billing rate." *Id.* (citing *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 886 F.Supp. 445, 479 (E.D.Pa. 1995); *Amico v. New Castle County*, 654 F.Supp. 982, 1003 (D.Del.1987)); *see also Auman v. Muhlenberg School Dist.*, No. 99–5445, 2000 WL 520984 (E.D.Pa. May 1, 2000). Accordingly, calculating the lodestar of Plaintiffs' Counsel using current hourly rates is appropriate.

was spent on factual investigation. Desmond Aff., Exhibit 1. In addition, Weiss & Yourman allotted more than one-third of its total hours to pre- and post-filing investigation. Tullman Aff., Exhibit A.

The Circuit has recognized that "multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *In re Prudential*, 148 F.3d at 341; *In re Cendant PRIDES*, 243 F.3d at 742 (recognizing various lodestar multipliers). What follows are some examples of the multipliers utilized in common fund cases decided in the past few years:

| CASE | MULTIPLIER | AMOUNT OF FEES |
|---|---|---|
| *In re Aetna, Inc. Sec. Litig.*, No. MDL–1219, 2001 WL 20928 (E.D.Pa. 4 Jan. 2001) | 3.6 | $24.3 million |
| *Cullen v. Whitman Medical Corp.*, 197 F.R.D. 136 (E.D.Pa. 2000) | 2.04 | $2.4 million |
| *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D.Pa.2000) | 2.7 | $33.5 million |
| *In re Sumitomo Copper Litig.*, 74 F.Supp.2d 393 (S.D.N.Y.1999) | 2.5 | $32 million |
| *Kurzweil v. Phillip Morris Co.*, No. 94–2373, 1999 WL 1076105 (S.D.N.Y.30 Nov.1999) | 2.46 | $37.1 million |
| *Local 56, United Food & Commercial Workers Union v. Campbell Soup Co.*, 954 F.Supp. 1000 (D.N.J.1997) | 2.39 | $3 million |

In light of the above-noted cases, a multiplier of 2.81 may seem slightly high. There was, however, a heightened risk of nonpayment in this case, due to the bankruptcy of SCII and the fact that the D & O Policy is wasting asset. As such, a multiplier of 2.81 appears reasonable.

### 9. *Summary of Gunter Analysis*

As to the Defendants, the first, third and seventh *Gunter* factors weigh in favor of approval. The second and fourth factors weigh only slightly in favor of approval, while the sixth factor is neutral. The fifth factor weighs overwhelmingly in favor of approval as to the Defendants. As to Arthur Andersen, the first, third and seventh factors weigh in favor of settlement. The second and fourth weigh only slightly in favor, while the fifth and sixth factors are neutral. For the Defendants and Arthur Andersen, the lodestar cross check favors approval of the Application for Attorneys' Fees. Accordingly, after weighing all the relevant factors, the *Gunter* analysis weighs in favor of approval of the Application for Attorneys' Fees.

### 10. *Presence (or Lack) of a Retainer Agreement*

The Circuit has indicated another consideration relevant to the determination of the reasonableness of a fee award. The Circuit has stated that "courts should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel." *In re Cendant*, 264 F.3d at 283. The Circuit explained that "[t]his presumption will en-

sure that the lead plaintiff, not the court, functions as the class's primary agent vis-a-vis its lawyers." *Id.*

■ This presumption of reasonableness "may be rebutted by a prima facie showing that the (properly submitted) retained agreement fee is clearly excessive." *Id.* at 283–84. This clear excessiveness inquiry should be guided primarily by the factors set forth in *Gunter* for evaluating the fairness of a percentage fee. *Id.* (citing *Gunter*, 223 F.3d at 195 n. 1).

Plaintiffs' Counsel represent that Lead Plaintiffs expressly retained Bernstein Liebhard in writing as their counsel at the outset of litigation. Supplemental Memorandum at 2. In their certifications submitted in support of the Motion to Consolidate, Lead Plaintiffs stated:

> Plaintiff has reviewed the complaint filed in this matter and has authorized the filing of a complaint based on similar allegations in a related or amended complaint. Plaintiff retains [Bernstein Liebhard] and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

*Id.* at 3. In a 21 November 1999 cover letter from Bernstein Liebhard to SCII shareholders, Bernstein Liebhard advised Lead Plaintiffs:

> [Bernstein Liebhard] represents the plaintiff in the enclosed class action complaint and numerous other shareholders of [SCII] who acquired their shares during the Class Period. The firm has significant experience in prosecuting class actions on behalf of defrauded shareholders and has undertaken this litigation on a contingent fee basis and will only be paid its legal fees following Court approval of the result of the litigation.

*Id.* Likewise, in a letter from non-lead counsel to the plaintiff in one of the Indi-

vidual Actions, counsel described the representation as follows:

> Our representation of you and the class of shareholders in this matter will be on a purely contingent basis. We will be paid a fee and recover our expenses *only* if we achieve a settlement or judgment for the class of investors of which you are a member and which you will represent and only if the Court permits it. Any fee or expense we recover *will* only be paid out of the funds we recover for the class of investors, None will ever be paid directly by you. If we are unsuccessful, we will not receive any fees or costs.

Fairness Hearing Transcript at 29:3–12. Also, it appears Bernstein Liebhard informed Lead Plaintiffs orally that:

> (1) counsel would pursue the class action entirely on a contingent fee basis,
>
> (2) counsel would only receive compensation if they successfully resolved the class action,
>
> (3) Lead Plaintiffs would not be personally responsible for attorneys' fees in the event the litigation proved to be unsuccessful,
>
> (4) fees would be awarded solely by the court after considering the Application for Attorneys' Fees, and
>
> (5) counsel prosecuting class actions generally receive attorneys' fees in the range of between twenty-five percent and forty percent of the settlement fund.

Supplemental Memorandum at 3–4. Plaintiffs' Counsel represented that Lead Plaintiffs indicated this fee arrangement to be acceptable. *Id.* at 4.

The New Jersey Rules of Professional Conduct (the "RPC") provide that "[w]hen a lawyer has not regularly represented [a] client, the basis or rate of the fee shall be communicated in writing to the client before or within a reasonable time after com-

mencing the representation." N.J. R.P.C. 1.5(b). The RPC permit a fee to be "contingent on the outcome of the matter for which the service is rendered." N.J. R.P.C. 1.5(c). The contingent fee arrangement:

> [must] be in writing and [must] state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated.

*Id.* RPC 1.5(c), therefore, requires all contingency-fee arrangements to be reduced to writing and contain the listed terms.[12] *See e.g. Dardovitch v. Haltzman,* 190 F.3d 125, 138 n. 10 (3d Cir.1999) (noting the rule requiring contingency-fee agreements to be in writing in a RICO action); *In re Trueger,* 140 N.J. 103, 114, 657 A.2d 847 (1995) (stating that, where counsel was retained to perform debt collection services, RPC 1.5(c) required that a contin-

gency-fee arrangement be reduced to writing); *Starkey, Kelly, Blaney & White v. Estate of Nicolaysen,* 340 N.J.Super. 104, 122, 773 A.2d 1176 (App.Div.2001) (contingency-fee arrangement based on the sale of real property had to be in writing).

█ It appears from the submissions of Plaintiffs' Counsel, that a contingent-fee retainer agreement was entered into in connection with this matter. Plaintiffs' Counsel maintained that Lead Plaintiffs retained Bernstein Liebhard in writing at the commencement of the litigation. *Id.* at 2. The letters from Bernstein Liebhard and non-lead counsel both state that Plaintiffs' Counsel is representing the plaintiffs on a contingent basis, that any award of fees would be at the discretion of the Court, and that expenses would be deducted from any recovery. Supplemental Memorandum at 3; Fairness Hearing Transcript at 29:3–12. Moreover, Bernstein Liebhard orally informed Lead Plaintiffs that the contingency fee would be determined by the Court after consideration of the Application for Attorneys' Fees and that the award would likely be

---

12. Plaintiffs' Counsel contended that the contingency-fee agreement in this case is permissible under New Jersey law. Supplemental Memorandum at 6. In reaching this conclusion, however, Plaintiffs' Counsel did not mention the mandate of RPC 1.5(c) that contingency fees must be in writing. Plaintiffs' Counsel only referred to RPC 1.5(c) for the proposition that contingency-fee arrangements are permissible. *Id.* at 5. This assertion is correct, but neglects the requirements imposed on such arrangements.

Plaintiffs' Counsel, in support of its position that the fee arrangement complies with New Jersey law, also cited to Rule 1:21–7 of the New Jersey Court Rules ("N.J.R.C."). *Id.* at 5–6. Plaintiffs' Counsel argued that Rule 1:21–7 applies only to general negligence cases and not to business torts, such as fraud. *Id.* at 5. It appears Plaintiffs' Counsel is correct; Rule 1:21–7 "does not apply to 'business torts' such as fraud or conspiracy to interfere with contractual relationships but includes all

typical negligence cases, such as auto accidents, product liability and 'slip and fall.' " N.J.R.C. 1:21–7 cmt. 11 (Gann 2002); *Incollingo v. Canuso,* 297 N.J.Super. 57, 65, 687 A.2d 778 (App.Div.1997) (Rule 1:21–7 did not apply to business tort class action). Rule 1:21–7, however, simply places restrictions on the calculation of a contingency fee in cases to which the rule applies. For example, the Rule states an attorney cannot contract to collect a contingency fee in excess of a specified percentage of the client's recovery. N.J.R.C. 1:21–7(c). The Rule does not address when a fee arrangement must be in writing or what terms that writing must include.

That Rule 1:21–7 does not apply to the present litigation, does not mean that obligations imposed by RPC 1.5 are also inapplicable. On the contrary, there is nothing in the text of RPC 1.5 or the applicable case law to indicate that the rule is not applicable to the type of case at hand.

between twenty-five and forty percent. Supplement Memorandum at 3.

It appears that the contingency fee agreement communicated (1) the contingent nature of the arrangement, (2) the method by which the contingency fee would be determined (i.e., by the court after considering the submissions of Plaintiffs' Counsel), and (3) the fact that expenses would be deducted from any recovery. Plaintiffs' Counsel also orally informed Lead Plaintiffs of the likely range of the percentage of any award. The communications memorializing the arrangement, however, did not state whether expenses would be deducted before or after the fee was deducted from the recovery. It appears, therefore, that, while a contingency fee was entered into in this matter, it did not fully comply with RPC 1.5.

 The failure to properly memorialize a contingent fee arrangement, however, will not prevent counsel from recovering fees. *See Starkey, Kelly,* 340 N.J.Super. at 123, 773 A.2d 1176; *Glick v. Barclays De Zoete Wedd, Inc.,* 300 N.J.Super. 299, 313, 692 A.2d 1004 (App.Div.1997); *Vaccaro v. Estate of Gorovoy,* 303 N.J.Super. 201, 207, 696 A.2d 724 (App.Div.1997). Plaintiffs' Counsel can still recover the reasonable value of their service under the theory of *quantum meruit. See Starkey, Kelly,* 340 N.J.Super. at 123, 773 A.2d 1176 (the "failure to enter into a written contingent fee agreement pursuant to RPC 1.5 would not preclude recovery in *quantum meruit* "); *Glick,* 300 N.J.Super. at 313, 692 A.2d 1004; *Starkey,* 340 N.J.Super. at 123, 773 A.2d 1176. In the absence of a fully compliant contingency fee arrangement, therefore, counsel can still recover a "reasonable fee based on the services actually rendered." *Glick,* 300 N.J.Super. at 313, 692 A.2d 1004.

*Cendant* did not address whether the subject retainer agreement complied with relevant professional conduct rules. *In re Cendant,* 264 F.3d at 282–84. The presumption the Circuit created in that case was based on the premise that lead plaintiffs typically will have the requisite experience and incentive to enter into a favorable retainer agreement. *Id.* at 282–83. The Circuit explained that "the lead plaintiff is in the best position, under the PSLRA's scheme, to determine (at least initially) what its lead counsel's fee should be." *Id.* This rationale does not change simply because the written memorial of the fee arrangement lacks some of the required terms.

It appears that the Application for Attorneys' Fees was submitted pursuant to a contingency-fee retainer agreement. The Application for Attorneys' Fees is entitled to the presumption of reasonableness, as discussed in *Cendant.* Because the Application for Attorneys' Fees has been deemed reasonable under the *Gunter* analysis, it also survives the clear excessiveness standard. Plaintiffs' Counsel, however, failed to indicate in writing, as required by RPC 1.5(c), whether expenses would be deducted before or after the award of fees was deducted from the recovery. Plaintiffs' Counsel should not be permitted to take advantage of the ambiguity created by its own omission. The contingency-fee arrangement will be construed in favor of the plaintiffs. The award of attorneys' fees, therefore, will be calculated after the expenses are deducted from the Settlement Fund, as discussed below.

In conclusion, in light of the *Gunter* analysis and the presumption of reasonableness afforded by the contingency-fee arrangement, the Application for Attorneys' Fees is reasonable and is approved. The amount requested under the Application for Attorneys' Fees, however, will be

reduced to the extent that the percentage award will be calculated after the deduction of expenses. The amount awarded pursuant to the Application for Attorneys' Fees will also be reduced to reflect the determination regarding the requested interest, discussed below.

### 11. Reimbursement of Expenses

■ Plaintiffs' Counsel seek reimbursement of $190,794.63 for expenses incurred in the prosecution of this matter, plus interest thereon. Fleischman Decl., ¶ 52. Counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action. Abrams v. Lightolier, Inc., 50 F.3d 1204, 1225 (3d Cir.1995); Cullen, 197 F.R.D. at 151 (finding requested fees to be adequately documented, proper and reasonable); Lazy Oil Co. v. Wotco Corp., 95 F.Supp.2d 290, 323 (W.D.Pa.1997).

■ The expenses for which Plaintiffs' Counsel seek reimbursement include (1) photocopying and reproduction, (2) postage, messenger services and express mail services, (3) telephone and facsimile charges, (4) filing and witness fees, (5) computer-assisted research, such as Lexis and Westlaw, (6) fees of experts and consultants, and (7) dining, hotel and transportation expenses incidental to out-of-town travel. Fleischman Aff., Exhibit 2; Desmond Aff., Exhibit 2; Lifshitz Aff., Exhibit 2; Tullman Aff., Exhibit B. Plaintiffs' Counsel are not seeking reimbursement of several categories of costs, such as meals and car service charges that were not incidental to out-of-town travel, that they claim amount to thousands of dollars in expenses. Fleischman Decl., ¶ 57.

From the submissions, it appears the expenses requested by Plaintiffs' Counsel were adequately documented, reasonable and appropriately incurred in the litigation of this matter. Several courts have held that photocopying expenses, telephone and facsimile charges, and postage, messenger and express mail service charges are reasonably incurred in connection with the prosecution of a large litigation. Abrams, 50 F.3d at 1225: Cullen, 197 F.R.D. at 151; In re Residential Doors Antitrust Litig., No. 96–2125, 1998 WL 151804, at *2 (E.D.Pa. April 2, 1998). Likewise, witness fees and the costs associated with expert witnesses and consultants are often deemed incidental to litigation. Cullen, 197 F.R.D. at 151. Computer-assisted legal research has been found incidental, if not essential, to successful prosecution of a litigation. Id.; In re Residential Doors, 1998 WL 151804, at 11; Weikel v. Tower Semiconductor Ltd., No. 96–3711, slip op. at 43 (D.N.J.30 November 1999).

It appears that none of the amounts claimed by Plaintiffs' Counsel for any of these categories of expenses is excessive. Moreover, Plaintiffs' Counsel has specifically excluded from its application requests for certain expenses—meals and transportation not incidental to travel—which previously have been deemed beyond the scope of reasonableness. See Weikel, No. 96–3711, at 43. Accordingly, the request for reimbursement of expenses is approved. The award of expenses, however, will be reduced to reflect the determination regarding the requested interest discussed below.

### 12. Interest on Attorneys' Fees and Expenses

■ Plaintiffs' Counsel also request an award of interest (the "Award of Interest") on the fees and expenses awarded in this matter from the date of the Fairness Hearing to the date of payment. Memorandum in Support of Application for Attorneys' Fees at 20. Plaintiffs' Counsel

request that the interest be calculated at the same rate earned by the Settlement Fund. *Id.* The Circuit has determined that a judgment awarding attorneys' fees qualifies as a money judgment upon which post-judgment interest can be awarded. *Eaves v. County of Cape May*, 239 F.3d 527, 535 (3d Cir.2001). The Circuit has held, however, that "post-judgment interest on an attorneys' fee award runs from the date that the District Court enters a judgment quantifying the amount of fees to the prevailing party." *Id.; see also Lanni v. New Jersey*, 259 F.3d 146, 153 (3d Cir.2001) (same). Accordingly, Plaintiffs' Counsel are entitled to post-judgment interest on the fees and expenses awarded by this Opinion and Order.[13] That interest will be calculated from the date of this Opinion and Order, and not from the date of the Fairness Hearing.

*Conclusion*

Based on the foregoing, the Settlement is approved in its entirety. The Application for Attorneys' Fees is approved, except the percentage award will be calculated after the deduction from the Settlement Fund of the amount awarded as reimbursement of expenses. The request for reimbursement of expenses is also approved in the amount requested—$190,794.63. The Award of Interest is approved, but interest will begin to accrue from the date of this Opinion and Order. Interest will be calculated at the same rate as is earned by the Settlement Fund. Ac-

cordingly, Plaintiffs' Counsel are entitled to $1,436,401.79 in attorneys fees ($4,500,-000.00–$190,794.64 = $4,309,205.36. One third of $4,309,205.36 is $1,436,401.79.). As mentioned, including $70,471.48 in accrued interest, the Settlement Fund is valued at $4,570,471.48 as of 28 September 2001. The remaining corpus of the Settlement Fund available to SCII shareholders, therefore, is $3,134,069.69.

---

**13.** To the extent that the Award of Interest is a request for prejudgment interest, the request is denied. As discussed, the lodestar submitted by Plaintiffs' Counsel, which has been accepted, is based upon current hourly rates. *See* section B.8 *infra.* The Circuit has explained the use of current rates serves as a factor to compensate attorneys for delay in receipt of payment. *Id.; Keenan*, 983 F.2d at 476. Prejudgment interest shares an identical purpose to a delay factor, such as the use of current rates. *Library of Congress v. Shaw*,

478 U.S. 310, 322, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986); *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1102 (3d Cir.1995). Prejudgment interest, like a delay factor, is intended to compensate for delay in the payment of sums due. *Shaw*, 478 U.S. at 322, 106 S.Ct. 2957; *Starceski*, 54 F.3d at 1089. Because current hourly rates have been employed to account for any delay in payment experienced by Plaintiffs' Counsel, an award of prejudgment interest is inappropriate.